361 So.2d 148 (1978)
Chester COXWELL, Appellant,
v.
STATE of Florida, Appellee.
No. 51013.
Supreme Court of Florida.
July 20, 1978.
Timothy D. Harley and M. Howard Williams of Williams, Gibson & Harley, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Michael H. Davidson, Asst. Atty. Gen., Tallahassee, for appellee.
ENGLAND, Chief Justice.
Chester Coxwell was convicted of first degree murder for having procured the killing of his wife, and in accordance with the jury's recommendation he was sentenced to death by the trial judge. His conviction and sentence are brought to us for review pursuant to Article V, Section 3(b)(1), Florida Constitution, and Section 921.141(4), Florida Statutes (1975).
The pertinent facts preceding and surrounding Mrs. Coxwell's death are relatively uncomplicated. Coxwell and his wife owned a thriving bait shop in Liberty County and lived in a trailer on the same property. For some time prior to the slaying, their marriage had grown increasingly discordant because Coxwell, age 58, had become romantically involved with a 26-year-old girl who worked at the bait shop, Judy Barnes. Mrs. Coxwell, an extremely jealous and high-tempered woman, discovered the illicit relationship and fired Barnes. The affair between Coxwell and Barnes continued nonetheless, causing recurring disharmony in the Coxwell home and a series of threats among the characters in this love triangle.
The evidence adduced at trial indicated that Coxwell first attempted to procure someone to murder his wife approximately six months before the events which actually led to her death. The first individual contacted, a friend of Judy Barnes, declined Coxwell's offer of $5,000. A second prospect for the job participated with Barnes in *149 one unsuccessful attempt on Mrs. Coxwell's life, but then declined further involvement.[1]
When these efforts proved fruitless, Coxwell asked George Kilpatrick, who sometimes supplied bait to Coxwell's store, to assist in finding someone who would commit the crime. Kilpatrick testified that he and Coxwell discussed the matter almost daily over a period of two months, but that they were unable to settle on a satisfactory plan.[2] At some point during these conversations, Coxwell raised his compensation offer and persuaded Kilpatrick to do the job himself. Approximately one week before the crime, Kilpatrick told Nelson Hughley, a 16-year-old boy who lived with Kilpatrick and assisted him in gathering bait, that he had accepted Coxwell's proposal.
The dates of the criminal sequence, June 24 and 25, 1976, now become important. On the 24th Coxwell informed Kilpatrick that Judy Barnes had entered the hospital to create an alibi for herself, and that he wanted Kilpatrick to "hurry up" so that he could bring her home to his trailer. Shortly after midnight, Kilpatrick came to the trailer, lured Mrs. Coxwell out to the store on the pretext of having some bait to sell, and bludgeoned her on the head with an iron pipe. With Hughley's assistance, Kilpatrick then placed her body in the trunk of his car and proceeded to a secluded wooded area to dispose of the corpse. At some point along the way, they heard Mrs. Coxwell moaning in the trunk. Kilpatrick stopped the car and delivered another, and fatal, blow to her head. Three days later, the victim's body was discovered in a boat on Syfrett Creek.
Coxwell, who had apparently remained in the trailer until after the killers left, summoned the sheriff and reported his wife missing. Subsequent investigation led to his arrest, and he ultimately identified Kilpatrick and Hughley as the individuals who had come to his trailer on the night of the murder. After they were apprehended, tried, and convicted, both Kilpatrick and Hughley testified against Coxwell at his trial.
In this appeal, Coxwell alleges six procedural errors in his trial and asserts that the death sentence was improperly imposed. We have determined that one of the alleged errors will necessitate a new trial, so that we need not address all of the points presented.[3]
The state's principal witness against Coxwell was Kilpatrick, who testified that he agreed to commit the crime when Coxwell promised to give him $5,000 and a red truck. During the course of direct examination, the state sought to elicit from Kilpatrick a detailed account of his conversations with Coxwell regarding various plans which were discussed by them over the period of months leading up to the day of the crime. The transcript of the proceeding tells what occurred:
Q [prosecution continuing] Mr. Kilpatrick, you have had several conversations with Mr. Coxwell, then, about killing his wife, is that correct?
A Yes.
Q Did you go through with any of those plans you had previously talked about?
A Did we go through with those plans?
Q Yes, did you ever carry it out, the ones you talked about?
A No.
Q George, the 24th day of June, 1976, do you remember that day?
A Yeah, I does.
Q Did you go to Chester Coxwell's bait shop on that day?
A Yes.
Q What time did you get there?
A It was in the afternoon in between 3:30 and 4:00 o'clock.

*150 Q Did you talk with Chester on that day?
A Yes. Our conversation was that he said he had put his girlfriend in the hospital and he said when she come out of the hospital he wanted to bring her home, and he said his wife was in the way, and to hurry up.
Q To hurry up?
A. Yes.
[prosecutor]: Thank you. Nothing further.
The Court: All right, Mr. Mann [defense counsel]
CROSS EXAMINATION
BY MR. MANN:
Q How many conversations, approximately, do you recall having with Mr. Coxwell, Mr. Kilpatrick, concerning the various different plans to kill his wife?
A Well, I went to Bristol every day, and from the time this year since I been hauling baits over there to the time I got arrested, I'd say it was every day that I come over there, every day until that time. I'll say better than fifty or sixty times.
Q And every time he talked with you about killing his wife?
A Right.
Q The State just asked you a question, did you go through with any of those plans, and you answered no. Is that correct?
A Correct.
Q Did you kill Lela Mae Coxwell pursuant to any of these plans?
MR. RICHMOND: I object, Your Honor, as being beyond the scope of direct examination.
MR. MANN: I think he opened the door, Your Honor, with the question, "Did you go through with any of these plans."
MR. RICHMOND: The prior plans, Your Honor, the ones he testified about, before. It's beyond the scope of direct.
THE COURT: It is beyond the scope of direct examination. I will sustain the objection.[4]
Coxwell suggests that the trial court abused its discretion in sustaining the state's objection, and that the court's curtailment of defense inquiry at this crucial juncture constituted a deprivation of his absolute and fundamental right to cross-examine a witness who testifies against him, as guaranteed by the sixth amendment of the federal constitution.[5] The ruling of the trial court that the question on cross-examination went beyond the scope of direct examination, Coxwell argues, was not merely erroneous as being plainly related to Kilpatrick's testimony regarding the plans and conversations with Coxwell on the day of the crime, but was also prejudicial to Coxwell's defense because it forestalled the development of the defense theory that Judy Barnes had procured Mrs. Coxwell's death, as to which Kilpatrick obviously would have first-hand knowledge. In urging that curtailed cross-examination was reversible error, appellant basically relies on Coco v. State, 62 So.2d 892 (Fla. 1953).
Coco was a first degree murder case in which the state's fingerprint expert gave detailed testimony on direct examination as to his method of lifting and analyzing fingerprints from the murder weapon. He then identified certain exhibits as being fingerprint cards bearing the defendant's prints. When defense counsel sought on cross-examination to inquire concerning the results of the witness' comparison between defendant's fingerprints and those taken from the murder weapon, the state interposed an objection which was sustained by the trial court on the ground that the question exceeded the scope of direct examination. By aborting defendant's cross-examination, the state successfully conveyed to the jury a mistaken impression that the *151 fingerprints matched, although the same expert had written a report concluding that the fingerprints on the murder weapon were not the defendant's.
On appeal, the state contended that the trial court's ruling was proper, but that if there was an error it was harmless since the defendant's identity had been independently established by eyewitness testimony. This Court nonetheless reversed Coco's conviction observing that:
"a fair and full cross-examination of a witness upon the subjects opened by the direct examination is an absolute right, as distinguished from a privilege, which must always be accorded to the person against whom the witness is called and this is particularly true in a criminal case such as this wherein the defendant is charged with the crime of murder in the first degree... . Cross-examination of a witness upon the subjects covered in his direct examination is an invaluable right and when it is denied to him it cannot be said that such ruling does not constitute harmful and fatal error."[6]
The Court then quoted the following passage with approval:
"`... when the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts ... or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated, cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief... .'"[7]
The Court emphasized that the inquiry was essential both as to the identity issue and to defense counsel's ability to lay a predicate for impeachment of the state's witness.
The state would distinguish Coco from this case by noting that no physical evidence of the crime was involved and that no proffer was made of matters which the defense intended to establish by the proposed cross-examination. It also argues that the limitation ruling was not erroneous because Kilpatrick had never mentioned the details of any of the alleged plans to kill Mrs. Coxwell, because prosecutorial inquiry was carefully limited to plans discussed prior to the day of the crime, and because Coxwell could have made Kilpatrick his own witness if he desired to develop testimony encompassing plans formulated by another on the day of the crime.[8] Finally, the state argues that any improper limitation of appellant's inquiry on this matter was harmless because the theory which the defense proposed to construct could have been established through the testimony of other witnesses, and because Coxwell's culpability for the offense would in no way be diminished by evidence that Kilpatrick committed the crime pursuant to a plan other than one which they had actually discussed.[9]
*152 Acknowledging that there are certain factual differences, we are nonetheless convinced that Coco is controlling authority in every material respect. Here, as in Coco, the defendant in a capital case was denied the opportunity to elicit testimony from a key prosecution witness as to the most critical factual issue in the case  identification. Here, as in Coco, the state's narrow characterization of the scope of direct examination ignores the expansive perimeters of subject matter relevance which the constitutional guarantee of cross-examination must accommodate to retain vitality. And here, as in Coco where the fingerprint expert "purportedly gave the jury a complete picture"[10] yet in reality did not, Kilpatrick's abridged testimony concerning his conversations with Coxwell left an accusatory implication which Coxwell was barred from refuting.
The record shows that defense counsel simply asked Kilpatrick whether he had killed Mrs. Coxwell pursuant to any of the plans allegedly discussed with appellant. It is clear that the question was germane to Kilpatrick's discussion of plans on direct examination, whether defense counsel's goal was to uncover an intervening principal or to establish a foundation for subsequent impeachment.[11] As in Coco, "we can only conjecture or surmise what the outcome would have been had the appellant been granted, rather than denied, his inalienable right of cross-examination."[12]
Our conclusion here should not be construed to suggest that the scope of cross-examination is wholly without bounds, nor that a discretionary curtailment of the inquiry before it exceeds those limits can never be harmless error if no prejudice can be demonstrated.[13] We only hold that where a criminal defendant in a capital case, while exercising his sixth amendment right to confront and cross-examine the witnesses against him, inquires of a key prosecution witness regarding matters which are both germane to that witness' testimony on direct examination and plausibly relevant to the defense, an abuse of discretion by the trial judge in curtailing that inquiry may easily constitute reversible error.[14] In the present case, it clearly did.
Appellant's conviction is reversed, the sentence of death is vacated, and this case is remanded for a new trial.
It is so ordered.
ADKINS, BOYD, OVERTON and HATCHETT, JJ., concur.
NOTES
[1] Both Barnes and Wallace Atkins were subsequently charged with conspiring to murder Mrs. Coxwell as a result of this incident, and Barnes was convicted.
[2] At least one of these plans apparently was abandoned because it required Barnes' assistance. She refused to participate due to the notoriety of her relationship with Coxwell and a concern for being implicated in the killing.
[3] See, e.g., Duke v. State, 134 Fla. 456, 185 So. 422 (1938) (on rehearing).
[4] Trial Transcript at 170-73.
[5] See Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). See also Art. I, § 16, Fla. Const.; Knight v. State, 97 So.2d 115 (Fla. 1957).
[6] 62 So.2d at 894-95.
[7] 62 So.2d at 895, quoting 58 Am.Jur. Witnesses § 632, at 352 (1948).
[8] For this proposition the state refers us to Shargaa v. State, 84 So.2d 42 (Fla. 1955), where the relevance of a defense inquiry was never established. The same can hardly by said of the question propounded by defense counsel in the present case, and for that reason we find Shargaa unpersuasive. The same point was also rejected in Coco.
[9] Without regard to the plausibility of either contention, it is clear that alternate methods of proof or theories of defense are exclusively within the province of defense counsel through direct or cross-examination. This Court has no role in limiting counsel on the basis of later-developed alternatives. Cf. Busby v. Holman, 356 F.2d 75 (5th Cir.1966). The credibility of any witness or theory rests, of course, with the jury. Here, for illustration, Coxwell's effort to implicate Barnes as Kilpatrick's principal could be supported by the fact that she admitted having plotted to kill the victim, knew who was to commit the crime and when it was to take place, had an ample motive for hating the victim apart from her relationship with Coxwell, and was actually convicted of conspiring to kill the victim on another occasion. Taken together with other facts of record, it cannot be said that the possibility of her involvement is so remote that it could not give rise to a reasonable doubt among intelligent jurors.
[10] 62 So.2d at 897.
[11] See Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), suggesting that trial judges should be inclined to afford greater latitude on cross-examination when the object is to impeach a key prosecution witness. See also Vickery v. State, 50 Fla. 144, 38 So. 907 (1905); Sweet v. State, 235 So.2d 40 (Fla. 2d DCA 1970); Kirkland v. State, 185 So.2d 5 (Fla. 2d DCA 1966).
[12] 62 So.2d at 896.
[13] Tischler v. Apple, 30 Fla. 132, 11 So. 273 (1892).
[14] See Johnson v. Reynolds, 97 Fla. 591, 121 So. 793 (1929).