440 So.2d 570 (1983)
Leo Alexander JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 61492.
Supreme Court of Florida.
September 15, 1983.
Rehearing Denied December 5, 1983.
*571 H. Randolph Fallin, Jacksonville, for appellant.
Jim Smith, Atty. Gen. and Barbara Ann Butler, Asst. Atty. Gen., Jacksonville, for appellee.
ADKINS, Judge.
This is an appeal from a judgment of the Fourth Judicial Circuit, Duval County. The court adjudicated the appellant, Jones, guilty of murder in the first degree and followed the jury recommendation in sentencing him to death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
We have carefully reviewed each of appellant's stated grounds of appeal as the discussion to follow will show. We have considered the entire record of the proceedings below in order to determine whether the jury's verdict of guilt was supported by substantial, competent evidence. We have further reviewed the sentencing proceeding to determine whether the sentence of death is appropriate to this case under law. § 921.141(4), Fla. Stat. (1981). We affirm the conviction and the sentence.
*572 The evidence at trial showed that on May 23, 1981, shortly after 1:00 A.M., Officer Thomas J. Szafranski was shot in his squad car at the intersection of 6th Street and Davis Street, Jacksonville, Florida. Officer Wilmouth was first on the scene. While Wilmouth waited for medical assistance to arrive a group of people came out of a nearby bar and approached him. One unidentified member of the group indicated that the shots had come from the two-story apartment building fronting the 6th and Davis Street intersection. Thereafter Wilmouth proceeded to investigate this building.
Officer Mundy had been informed of the incident by radio and quickly joined Wilmouth in the investigation. According to Mundy, the reputation of the apartment building in question was well travelled in law enforcement circles. Mundy entered the building fully aware that the vacant lower left apartment was a known "stash house" harboring drug users, vagabonds and other street criminals.
The two officers' search of the building's lower level produced nothing. However, Wilmouth informed Mundy that he had heard "shuffling" in the upper left apartment. Thereafter Mundy approached this apartment, knocked on the door, and proceeded to identify himself as a police officer. His repeated knocking, however, went unanswered. When Mundy continued to hear voices coming from within he entered the apartment; there he confronted appellant and appellant's cousin, Bobby Hammond, charging them both with attempted first-degree murder. During a cursory search of the apartment, assisting officers located several high-powered rifles, resting in plain view, but did not, at that time, disturb them.
Both appellant and Hammond were then transported to the Police Memorial Building. There, after being given repeated Miranda warnings by Officer Eason, appellant signed a statement incriminating himself and exonerating his cousin, Hammond.
At trial the appellant filed two motions to suppress. The first motion was directed toward the written statement given to Detective Eason. The second sought suppression of all items of evidence seized from appellant or from appellant's residence. The trial court denied both motions after determining that appellant's confession was freely and voluntarily given, and that the warrantless search was justified under the circumstances.
In his first point on appeal, appellant contends that the warrantless police search violated his fourth and fourteenth amendment protections against unreasonable searches and seizures; and this entry being unconstitutional all evidence seized pursuant to the search should have been suppressed. We do not agree.
The fourth and fourteenth amendments do indeed safeguard against a warrantless entry into a person's home for purpose of a routine felony arrest. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, where exigent circumstances exist, certain warrantless entries are permitted. Arango v. State, 411 So.2d 172 (Fla.), cert. denied, 457 U.S. 1140, 102 S.Ct. 2973, 73 L.Ed.2d 1360 (1982); Williams v. State, 403 So.2d 430 (Fla.3d DCA 1981); Pomerantz v. State, 372 So.2d 104 (Fla. 3d DCA 1979), cert. denied and appeal dismissed, 386 So.2d 642 (Fla. 1980).
In the case before us, the arresting officers were confronted with a potentially deadly situation. That exigent circumstances existed is without doubt. One man lay mortally wounded from a sniper's bullet while the sniper himself remained at large in a densely populated residential section. The very nature of such a brutal and random attack required swift and effective police action in order to prevent additional harm to innocent members of society. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would endanger their lives or the lives of others." Warden v. Hayden, 387 U.S. 294, 298-299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967). Here the record firmly supports the officers' belief that the suspect was inside the apartment. The delay, *573 incident to obtaining a warrant to search said apartment, would have exposed both the officers and the other tenants to serious danger. In light of these factors the warrantless entry into appellant's apartment was justified. See Dorman v. United States, 435 F.2d 385 (D.C. Cir.1970).
Appellant further argues that the officers' intrusion into his dwelling violated section 901.19(1), Florida Statutes (1981)  The Knock and Announce Statute. Appellant specifically contends that while the officers did knock, they failed to announce their purpose prior to entry. We do not agree.
Here, strong argument can be made that there was substantial compliance with the statute notwithstanding a failure to announce the officers' purpose. Moreover, under certain limited exceptions an officer may enter a dwelling to effect an arrest without complying with section 901.19(1). Raffield v. State, 351 So.2d 945 (Fla. 1977). This Court, in Benefield v. State, 160 So.2d 706 (Fla. 1964), advanced several exceptions to the knock and announce requirements of section 901.19(1), Florida Statutes, stating in pertinent part:
As we interpret the common law authorities in relation to § 901.19(1), Florida Statutes, F.S.A., we conclude that even if probable cause exists for the arrest of a person, our statute is violated by an unannounced intrusion in the form of a breaking and entering any building, including a private home, except (1) where the person within already knows of the officer's authority and purpose; (2) where the officers are justified in the belief that the persons within are in imminent peril of bodily harm; (3) if the officer's peril would have been increased had he demanded entrance and stated the purpose, or (4) where those within made aware of the presence of someone outside are then engaged in activities which justify the officers in the belief that an escape or destruction of evidence is being attempted.
160 So.2d at 710 (emphasis supplied). We find the third Benefield exception to apply in the instant case. As previously determined, the officers were faced with exigent circumstances. The record established that there was strong reason to believe the sniper was present within the apartment and had ready access to firearms. Accordingly, the officers were reasonable in concluding that an announcement of purpose would have increased their peril. See Williams v. State, 403 So.2d 430 (Fla. 3d DCA 1981). Inasmuch as there were exigent circumstances present and full compliance with section 901.19(1), Florida Statutes (1981), would have further endangered the lives of the officers, their failure to comply with the Knock and Announce Statute was justified. The trial court, therefore, correctly denied appellant's motion to suppress.
Appellant's second point on appeal challenges the trial judge's denial of his motion to suppress the following statement:
L.J. I, Leo Jones have been given my rights and I fully understand them and am making this statement on my own free will. I have given Det. Eason permission to write this statement for me. I, Leo Jones on 23 May 81 took a rifle out of the front room of my apartment and went down the back stairs and walked to the front empty apartment and shot the policeman through the front window of the apartment. I then ran back upstairs and hid the gun or rifle and then the police came. L.J.
Appellant argues that this statement, which he admits to signing, was obtained under coercive circumstances. His position, however, is not supported by the record.
The trial judge specifically found appellant's statement to be freely and voluntarily given. Such a finding comes before this Court with "the same presumption of correctness which attends jury verdicts and final judgments." Stone v. State, 378 So.2d 765, 769-70 (Fla. 1979), cert. denied, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980). In the case sub judice this "presumption of correctness" has not been eroded by appellant's argument.
*574 Contrary to appellant's contention, the statement was properly admitted at trial notwithstanding appellant's refusal to sign a written waiver form foregoing his Miranda rights. A refusal to sign a written waiver form is not a conclusive indication that a suspect wished to remain silent. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Furthermore, the trial judge was quite proper in determining that the appellant had implicitly waived his Miranda rights. Implicit waiver can operate as effective waiver especially where adequate Miranda warnings are given and the suspect indicates an understanding thereof. Jordan v. State, 334 So.2d 589, 592 (Fla. 1976). The record firmly establishes that appellant rendered his statement after having been first properly advised of his Miranda rights and having evidenced an understanding thereof. From such conduct we can safely infer appellant's intent to waive his Miranda protections.
Appellant contends further that his confession was obtained after he was threatened with the possibility of his cousin, Bobby Hammond, being charged with a capital offense. After reviewing the record it is apparent that the officers involved in the interrogation session in no way offered to cease criminal investigation of Hammond in exchange for appellant's confession. In fact, Officer Eason specifically instructed appellant that it would be "impossible" to guarantee Hammond's freedom if appellant should talk with police. Eason did, however, state that if Hammond was not involved with the shooting, he would not be charged with the crime. This statement carries no taint of deception. Eason's interchange with the appellant was proper, truthful, and totally devoid of unlawful coercion. Furthermore, appellant's assertions that he was physically abused prior to giving his statement cannot be substantiated. The record is in accord with the trial court's finding that appellant's statement was freely and voluntarily given. The trial court was proper in admitting said statement at trial.
In his third point on appeal appellant contests the trial court's admission of non-expert testimony. He specifically contends that Officer Mundy was not qualified to testify that, in his opinion, the mark on the "stash house" window sill was made by the recoil of a high-powered rifle. This argument is also without merit.
In Peacock v. State, 160 So.2d 541 (Fla. 1st DCA 1964), cert. denied, 168 So.2d 148 (1965), the court of appeal found similar non-expert testimony to be admissible and allowed a deputy to testify as to his visual comparison of a defendant's automobile tires with casts of tire prints found near the scene of the crime. In so doing, that court stated:
One does not have to be specially trained in order to make a visual comparison of this character. The subject is one upon which an intelligent person with some degree of experience  qualifications possessed by the witness  may and should be permitted to testify, leaving to the jury, as is its exclusive province, the determination of the credence and weight to be given thereto.
160 So.2d at 543. This reasoning can be properly applied to the issue at bar. Officer Mundy possessed a working knowledge of firearms gained through his training as a police officer and through his extensive work as an evidence technician. It was well within his realm of experience to offer the trier of fact his opinion as to this origin of the mark on the "stash house" window sill. In addition we detect no evidence indicating that the admission of Officer Mundy's testimony invaded the province of the jury. The credence and weight to be given to such testimony remained with the jury. Peacock, 160 So.2d at 543; White v. State, 375 So.2d 622 (Fla. 4th DCA 1979). Absent an obvious showing of error, this Court should not tamper with a trial judge's determination of admissibility. Buchman v. Seaboard Coast Line, 381 So.2d 229, 230 (Fla. 1980). After review of the record we find no such reason to disturb the trial court's decision to admit Officer Mundy's said testimony.
*575 Appellant's fourth point on appeal is directed toward another of Officer Mundy's conclusions, offered at trial, as to the origin of a previous unrelated sniper attack. Appellant argues that this testimony raised the spectre of a collateral crime for the purpose of inferring appellant's bad character or propensity to commit similar crimes and therefore violated the principle enunciated in Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). Appellant's argument is without merit. From the outset we find that Mundy's testimony was not offered to show appellant's bad character or propensity to commit the sniper attack. Rather, the challenged testimony was permitted on redirect subsequent to the following cross-examination of Mundy by defense counsel.
Q. When you got into the car down to the bus station in response to Officer Roberts telling you that an officer had been shot, at that point in time you had no specific information, did you, sir, that the shot had originated from the building that contained 1557?
A. No, sir, I did not.
Q. Based on your prior experiences you assumed that that would be a good location?

A. Yes, sir, that is correct.
Q. And isn't it also fair to say that when you drove up to that scene that you were going direct to that bottom apartment?
A. We had discussed it en route to the scene. Once I found out that it happened at Sixth and Davis Street we had discussed it, Officer Roberts and I did.
Q. So you were going directly to that apartment when you arrived at the scene?
A. Yes, that would have been the first apartment that I would have went to.
(Emphasis supplied.) During this portion of the cross-examination appellant's counsel questioned Officer Mundy's decision to investigate the "stash house". As a result, the reasonableness of Mundy's suspicion was thrust into issue. In order to clarify this impression lingering from cross-examination, Mundy was permitted to testify on redirect, as follows:
By Mr. Austin:
Q. Officer Mundy, on cross-examination by Mr. Fallin you were asked that based on prior experience you assumed that that would be a good location to go to, and the question was asked as you were leaving the bus station, that that would be a good location to go to, and you responded, "Yes;" is that correct?
A. Yes, sir, that is correct.
Q. I believe that you testified when you said that location, you meant the downstairs right-hand apartment that you first searched when you went to the scene?
A. That is correct, sir.
Q. And you said that you assumed it would be a good location. Was that because for any reason other than the fact that you knew it was a stash house?
A. Yes, sir, it is.
Q. What was the other reason?
A. The reason that I also thought about it was that it would be a good place for a shooting, is because at that place there it is completely empty, plus the other houses that are surrounded are occupied by occupants in that house and would be a good location, if you wanted to ambush or shoot someone from that residence.
Q. Did you have any other reasons?
A. Yes, sir, I did.
Q. What was that reason?
A. The reason was, from a prior incident that I did investigate.
Q. What was that and when was it?
A. That was a shooting at a vehicle.
THE COURT: Wait just 
BY MR. AUSTIN:
Q. No, just tell me what you did.
A. I'm sorry, repeat 
Q. What did you do to make you believe that it was a good location?
A. I did triangulation from a car that was involved in an incident.
Q. And what did you determine?

*576 A. I determined that the house and in the lower right-hand side, which is the downstairs empty apartment, was the origin of the shot.
Q. When was that?
A. This was approximately five to seven days earlier.
One of the objectives of redirect examination is to explain, correct, or modify the testimony gathered from cross-examination. See Hughes, Florida Evidence Manual § 167 (1981). Mundy's testimony, being offered to dispel doubt raised during cross-examination, fell well within the scope of proper cross-examination.
This Court has consistently affirmed "the concept that all relevant evidence having probative value is admissible save to attack character even though it would have a tendency to suggest the commission of a separate crime." Williams, 110 So.2d 654, 660 (Fla. 1959); see also Straight v. State, 397 So.2d 903 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981); Ashley v. State, 265 So.2d 685 (Fla. 1972); State v. Norris, 168 So.2d 541 (Fla. 1964). During redirect appellant was never expressly linked to the prior sniper attack. Here the probative value of Mundy's testimony clearly outweighs the possibility of prejudicial impact. Accordingly, the trial judge properly permitted the challenged testimony at trial.
In his fifth point on appeal appellant contends that the trial judge improperly restricted his cross-examination of Bobby Hammond and in so doing deprived him of his right of confrontation as guaranteed by the sixth amendment, United States Constitution. We disagree.
The parameters of a full and fair cross-examination should always encompass subjects opened on direct examination. Coxwell v. State, 361 So.2d 148, 152 (Fla. 1978); Coco v. State, 62 So.2d 892 (Fla. 1953). However, the scope of such cross-examination is not without bounds. Coxwell, 361 So.2d at 152. On direct examination Bobby Hammond stated that he was present in appellant's apartment on the night of May 23, 1981, and saw appellant moving toward the back of the apartment, rifle in hand. He further testified that he heard the back door open and some minutes later heard a shot being fired. Thereafter, Hammond reported seeing appellant, carrying a rifle, heading back into his bedroom. Direct examination ceased when Hammond stated he heard the police arrive. On cross-examination appellant attempted to elicit testimony from Hammond concerning statements he had allegedly made to police concerning events that occurred after they were arrested. The trial judge refused to grant such latitude and limited the scope of cross-examination to events and subjects of events occurring in the apartment prior to the arrival of the police.
Inasmuch as the subjects of Hammond's statements to the police were not opened on direct, there was no absolute right for appellant to cross-examine the witness on these matters. Compare, Coxwell; Coco. Furthermore, the trial judge's imposition of scope restrictions did not unequivocally deny appellant the opportunity to elicit the desired testimony from Hammond. The record shows that appellant specifically objected to Hammond being called as the court's witness. Moreover, appellant made no attempt to adopt Hammond as his own witness. Both of these alternatives were available to the appellant and both would have provided him with an opportunity to cross-examine without the challenged scope restrictions. See Steinhorst v. State, 412 So.2d 332 (Fla. 1982); cf. Coxwell, 361 So.2d 148. We therefore find that the trial judge acted within his broad range of discretion in limiting cross-examination to the subject matter addressed on direct. Maggard v. State, 399 So.2d 973 (Fla.), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981); Mikenas v. State, 367 So.2d 606 (Fla. 1978), cert. denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982); Hoy v. State, 353 So.2d 826 (Fla. 1977), cert. denied, 439 U.S. 920, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).
Appellant's sixth point on appeal challenges the trial judge's decision to permit mention of appellant's statement made prior *577 to the Szafranski incident. After close review of the record we find no indication that the trial judge acted improperly in receiving said testimony and thereafter denying appellant's motion for mistrial.
Approximately seven days prior to Szafranski's murder appellant was arrested for a traffic infraction. Appellant violently resisted this arrest. Officer Ritchey was involved with this arrest and appeared at trial as a state witness. Ritchey was allowed to testify that appellant stated to him that "he was tired of the police hassling him, he had guns, too and intended to kill a pig." Special care was taken to make no mention of this prior arrest to the jury. Ritchey's testimony was permitted by the trial judge pursuant to section 90.803(3), Florida Statutes (1979)  Statements of a Person's State of Mind to Prove Subsequent Acts of the Declarant. The statute, in pertinent part, provides:
(3) THEN EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION. 
(a) A statement of the declarant's then existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.

(b) However, this subsection does not make admissible:
1. An after-the-fact statement of memory or belief to prove the fact remembered or believed, unless such statement relates to the execution, revocation, identification, or terms of the declarant's will.
2. A statement made under circumstances that indicate its lack of trustworthiness.

(Emphasis supplied.) Appellant contends that the statement should have been excluded because it was "made under circumstances that indicate its lack of trustworthiness." § 90.803(3)(b)(2), Fla. Stat. (1979). Appellant argues that the statement was elicited under an atmosphere of anger spawned from his arrest and confinement and is therefore unreliable. The trial court, however, found no indication of untrustworthiness arising from appellant's location at the time of the statement. After detailed study of the record we agree with the trial court. Appellant's statement of his intention to kill a police officer contains sufficient probative value to draw the inference that the act was done. It was therefore properly admitted as an exception to the hearsay rule pursuant to section 90.803(3)(a)(2).
Appellant also attacks his sentence of death and in so doing challenges the trial court's finding of aggravating factors. After thorough review of the record, the sentencing order, and the presentence investigation report we find no merit to appellant's contention.
In imposing the death penalty the trial judge found three aggravating circumstances applicable:
(1) prior conviction of a felony involving the use or threat of violence to some person. Section 921.141(5)(b);
(2) capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. Section 921.141(5)(g);
(3) murder was committed in a cold, calculated and premeditated manner without any pretense of any moral or legal justification. Section 921.141(5)(i).
With each factor found, the trial judge made several findings of fact in support thereof. No mitigating circumstances were found.
The trial judge's findings of the second and third aggravating factors are clearly substantiated by the record. They have been considered and are hereby approved. Appellant shot and killed Szafranski while the officer was travelling from an unrelated investigation, in uniform, and on active duty. This Court has upheld the *578 applicability of section 921.141(5)(g) where, as in the instant case, the victim was killed while performing a legitimate governmental function. See Tafero v. State, 403 So.2d 355 (Fla. 1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 694 (1982). Furthermore, the very nature of the sniper attack manifests appellant's "cold and calculated" state of mind. The appellant killed without provocation on the part of the victim and without notice. The record is devoid of any evidence tending to justify the slaying. Accordingly the trial judge properly found this aggravating factor pursuant to section 921.141(5)(g).
Appellant's attack on the trial judge's finding of the first statutory aggravating factor deserves further comment. One of the statutory aggravating circumstances that a trial judge may consider in determining whether or not to impose the death penalty is set out in section 921.141(5)(b), Florida Statutes (1981): "The defendant was previously convicted of another capital felony or of a felony involving the use or the threat of violence to the person." (Emphasis added.) In the case at bar, prior to sentencing, appellant had been convicted under section 784.07, Florida Statutes (1981), for battery of a law enforcement officer, a third-degree felony. This conviction stemmed from an incident where appellant was stopped for a traffic infraction and thereafter violently resisted arrest. We find that the judgment of the conviction expressly disclosed the violent nature of the prior felony and that the trial judge properly considered the conviction as a statutory aggravating factor pursuant to section 921.141(5)(b). Compare, Mann v. State, 420 So.2d 578 (Fla. 1982) (defendant's record did not sufficiently disclose a conviction of violent crime). While appellant's conviction (battery of a law enforcement officer) alone substantiates a finding of an aggravating factor pursuant to section 921.141(5)(b), the trial judge offered additional factual circumstances in support stating:
V. SUMMARIZATION OF AGGRAVATING CIRCUMSTANCES
A. WHETHER THE DEFENDANT HAS PREVIOUSLY BEEN CONVICTED OF A FELONY INVOLVING THE USE OR THREAT OF VIOLENCE TO SOME PERSON.
FACT:
On September 24, 1981, the Defendant entered a plea of guilty to the crime of Battery on a Law Enforcement Officer as charged in Count Four of Case Number 81-4333-CF, in and for the Fourth Judicial Circuit, Duval County, Florida.
Information reveals that when the Defendant was stopped for a traffic infraction police smelled odor of marijuana emanating from Defendant's automobile. Upon being arrested, Defendant resisted and physically confronted the police and had to be subdued and restrained.
FACT:
On June 7, 1965, as a 15-year-old juvenile, the Defendant shot another man with a .22 caliber revolver and on June 18, 1965, was committed to the Florida School for Boys in Marianna, Florida.
Even though Defendant was not convicted of a felony because he was a juvenile, such an incident involves the use of violence to an innocent person and is removed from felony classification only because of the Defendant's age.
FACT:
On May 23, 1981, when the Defendant was arrested in 1557 North Davis Street following the shooting of Officer Szafranski he engaged in physical, bodily conflict with the police officers and had to be physically subdued and restrained.
At that time and now Defendant was trained and skilled in the use of karate.
FACT:
Defendant now stands before this Court as the convicted murderer of Officer Thomas J. Szafranski on May 23, 1981. He shot and killed Officer Szafranski with a .30-.30 Winchester Marlin high powered rifle inflicting fatal wounds to the head.
There is an aggravating circumstance under this paragraph. The Defendant has been convicted of a felony of Battery on a Law Enforcement Officer and Murder *579 in the First Degree. As a juvenile he was committed for the unlawful shooting of another innocent person.
The trial judge continued to state that while appellant's juvenile shooting offense and the resisting arrest charge were not reduced to felonies within the meaning of section 921.141(5)(b), and could not be accepted as such, these circumstances were being offered in support of the statutory aggravating circumstances found.
Appellant, citing Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir.1982), contends that the trial judge's alleged reliance on nonstatutory aggravating factors renders his death sentence unconstitutional under the eighth and fourteenth amendments. While this Court is not bound by the Eleventh Circuit's ruling, we are compelled to address the holding in Proffitt, and, in so doing, to distinguish that decision from the instant case.
In Proffitt, the Eleventh Circuit found that the trial judge had relied on nonstatutory aggravating factors in support of the death penalty and had therefore:
transcended the list of aggravating factors set forth in the Florida statute and substituted his own judgment of what circumstances justify capital punishment for that of the Florida Legislature. In so doing, the trial judge not only committed error under the state law, see Brown v. State, 381 So.2d 690, 696 (Fla. 1980); Elledge v. State, 346 So.2d 998, 1002 (Fla. 1977); he also exceeded the federal constitutional limitations imposed by Furman on capital sentencing by increasing the risk that the death penalty would be imposed in an arbitrary and capricious manner.
685 F.2d 1227, 1267. This decision was based, in large part, on four determining factors:
(1) that the trial judge expressly relied upon nonstatutory aggravating factors in support of the death sentence;
(2) that only one out of three statutory aggravating factors found by the trial judge could be constitutionally upheld;
(3) that, by itself, the one valid aggravating factor was not sufficient to mandate the imposition of death; and
(4) that the trial judge never specifically denied the presence of mitigating factors, but rather indicated that such factors in mitigation were "primarily negated" by the aggravating circumstances he found.
It is apparent that the Eleventh Circuit, after being confronted with the aforementioned factors, could not state with reasonable certainty that the one valid aggravating factor sufficiently counterbalanced the indicia of mitigating circumstances so to justify the sentence of death. Moreover, the court could not discount the fact that the trial judge blatantly relied upon nonstatutory aggravating factors in the imposition of the death penalty.
The issue before us has little resemblance to that which faced the appellate court in Proffitt. Here, there is no clear indication that the trial judge based his decision to impose the death penalty upon nonstatutory aggravating factors. In fact, the trial judge expressly asserted in the sentence order that the nonstatutory aggravating circumstances were mentioned merely in addition to the already established statutory aggravating factors. We see no reason in the record to now question this assertion. The trial judge's references to appellant's juvenile record and his resisting arrest charge were, in effect, surplusage and had no conclusive bearing on the three specific and independently valid findings of statutory aggravating factors. Moreover, the trial court expressly stated that there were no mitigating circumstances present. Accordingly, there being no circumstances in mitigation to counterbalance the three existing valid aggravating factors, death was the proper sentence. State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
In light of the foregoing, we find that the trial court's decision was proper. Therefore, the conviction and the sentence imposed by the trial court are affirmed.
It is so ordered.
*580 ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and EHRLICH, JJ., concur.