901 So.2d 260 (2005)
Liborio ROMERO, Appellant,
v.
STATE of Florida, Appellee.
No. 4D02-5070.
District Court of Appeal of Florida, Fourth District.
April 27, 2005.
*261 Carey Haughwout, Public Defender, and David John McPherrin, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Sue-Ellen Kenny, Assistant Attorney General, West Palm Beach, for appellee.
TAYLOR, J.
Liborio Romero appeals his criminal convictions for first degree murder and manslaughter in a double slaying. We affirm the denial of the defendant's motions for judgment of acquittal. However, we reverse and remand this case for a new trial, because the trial court erred in limiting the defendant's cross-examination of a state witness, and the state compounded the error by commenting on the excluded testimony during closing argument.
There were no witnesses to this double-homicide and very little physical evidence to shed any light on the killings. The state's theory was that the defendant *262 killed both Galaciano Trujillo-Lopez (Galaciano) and Adan Cornejo-Cornejo (Adan) with his pistol after an evening of drinking, for motives that were unclear. The defendant asserted that Adan shot and killed Galaciano, after which the defendant attacked Adan with a pipe, retrieved the gun from him, and shot him in self-defense.
According to the state's evidence, Adan's wife, Linda Cornejo-Cornejo, drove Adan and his friend, Galaciano, to a cantina on the night of the shootings. Mrs. Cornejo-Cornejo and Galaciano's wife, Agueda Benitez, testified that the two men were good friends who never fought or argued. The owner of the cantina, Joaquin Dominguez, testified that Adan, Galaciano, and the defendant were drinking and "talking between them." At closing time, the three men left the cantina. The defendant's truck was parked in front. Within a few minutes after locking the door to the cantina, Dominguez heard a loud noise but saw nothing in the parking lot when he looked outside the window.
Upon leaving the cantina about thirty minutes later, Dominguez saw a body lying on the ground near the telephone booth in the parking lot. It was identified as the body of Adan. The body of Galaciano was found lying on the other side of the building. Both men had sustained gunshot wounds to the head.
The medical examiner testified that the cause of Galaciano's death was a gunshot wound to his face. Adan had two kinds of injuries. He had a gunshot wound to the top right side of his head and multiple mechanical injuries, bruising, abrasions, and lacerations on his right forehead, right brow, nose, right face, chest, left clavicle, neck, and left shoulder blade. The medical examiner testified that the implement used to inflict the mechanical injuries was long and blunt and forcefully applied. He thought the weapon was shaped like a broomstick, only heavier. His examination revealed that Adan was struck three times in the back and sustained four separate injuries to his face. The medical examiner opined that these mechanical injuries were inflicted before the shooting.
The crime scene investigator, Captain Noel Stephen, testified to finding two spent .22 caliber shell casings and one live.22 caliber shell at the crime scene. Forensic firearm's expert, Michael Kelley, explained that if one pulls back the slide of a semi-automatic pistol with an unfired cartridge in the chamber, it will be ejected where the shooter is standing. The unfired cartridge found at the scene had been cycled through the gun in this fashion based on the tool marks left on the unfired cartridge.
The defendant was stopped by police as he left home the morning after the murders. In his first taped statement taken that morning, the defendant said that he had drunk about eighteen beers during the previous evening. The defendant seemed surprised at news of the killings and asked if Galaciano was one of the men who died. He denied being at the scene and said that Adan and Galaciano left him in the parking lot. He could not explain how blood got on his truck.
The defendant consented to a police search of his home. He did not initially volunteer any information about the firearm. When Deputy Gonzalez told him that they found a .22 magnum shell in a dresser, the defendant claimed that he had thrown the gun away. After being asked several times, the defendant finally disclosed that the gun was hidden above a tile in the drop ceiling. Kelley testified that in his opinion the bullet recovered from Adan's head was fired from the gun found at the defendant's residence.
*263 The defendant was taken back to the police station, where he gave a second taped statement. In his second statement, he said that after the three men came out of the bar they went directly to his truck, where they sat for five to ten minutes before Galaciano and Adan got into an argument. He saw Adan reach under the middle of the front seat, where the defendant kept his gun. Adan and Galaciano exited the vehicle and continued arguing. He saw them in front of the truck, with Galaciano backing up. He got out and picked up a pipe he saw on the ground. At that point, Adan shot Galaciano in the face. The defendant came up behind Adan and hit him with the pipe to knock the gun out of his hand. When he grabbed and kicked Adan, he was able to retrieve the gun. Then, when Adan came back at him, he shot him. As discussed below, the defendant's version of these events varied as he related them to the police.
The defendant explained that he was drunk and did not have a license. With two dead men on the ground, he got nervous and drove to Arcadia. He then turned around and drove home.
In a second interview, the defendant stated (as translated by Deputy Gonzalez):
DEPUTY GONZALEZ: He says that when he parked in the driveway, he sat there and thought he ... didn't want to leave because he didn't want to have to run from the cops forever. He said that he ... understood that he made the error of killing the guy and now he's gonna have to pay for it.
LIEUTENANT SUTTLE: Hehe said what?
DEPUTY GONZALEZ: He made the error of killing the guy and now he's gonna have to pay for it.
LIEUTENANT SUTTLE: Do you feel that you did anything wrong?
DEPUTY GONZALEZ: He says yes, he does.
LIEUTENANT SUTTLE: What does he feelwhat do you feel that you have done wrong?
DEPUTY GONZALEZ: He says that he feels like he didn't have no reason to shoot him because he already had the gun in his hand. He says thatthat he knows if [he] would have yelled at him, that [he] probably would have taken off running. But he says the alcohol and everything, he said by the time he did it, he already knew it was too late and when he noticed it was too late, it was too late.
At trial, the defendant testified consistent with his second statement to the police. He also testified that he does not keep a round in the chamber of his gun, but that his gun frequently fails. He explained that sometimes when it does not work, he has to rack the slide back and start over. He admitted that this is not something that Adan would have known.
Galaciano's wife testified that she and her husband had known Adan for about five years. She said that Adan and Galaciano were good friends, and that she never saw them argue or fight. On cross-examination, the defense asked Galaciano's widow whether Galaciano and the defendant were also friends. The state objected on the ground that the question was beyond the scope of direct examination. The trial court sustained the objection. The court advised defense counsel that he could recall the widow during his case in chief, but could not elicit this testimony on cross-examination. Defense counsel proffered that the widow would testify that Galaciano and the defendant were also friends. Rather than recall the widow during the defense's case (which consisted solely of the defendant's testimony), defense counsel *264 chose to release Galaciano's widow from her subpoena.
The defendant testified that he and Galaciano were good friends. In closing argument, the state argued:
Okay, let's talk about that. Why should you eliminate Adan as the person who shot Galaciano? Liborio Romero says he ... could not possibly have killed [Galaciano]. He was good friends with [Galaciano]. Why would he kill his friend? Well, why wouldn't that apply to Adan? The difference is, we don't have Adan's word or Galaciano's word or anyone to tell us that they were friends. We have people who knew them. Adan's wife, Linda Cornejo told you that they were good friends and never fought and never argued. [Galacianos' widow] told you that they had known each other for a long time, they were good friends, they never fought they never argued. Mr. Dominguez said that they were regulars, that they were friends. He never saw them fight and never argue.
We only have the defendant's word to tell you they were friends. [Galaciano's widow] did not say, yeah, they are good friends. That'smaybe that's what she remembers, but she did not say that.
At this point, the defendant objected on the ground that the prosecutor was now trying to take advantage of the court's exclusionary ruling. His objection was overruled.
The jury returned a verdict of manslaughter on the count related to Galaciano's death and a verdict of first degree murder on the count related to Adan's death.

Motions for Judgment of Acquittal
In reviewing a motion for judgment of acquittal, we apply a de novo standard of review. See Johnston v. State, 863 So.2d 271 (Fla.2003). In Johnston, the Florida Supreme Court reviewed the principles that govern a motion for judgment of acquittal:
Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. See Pagan [v. State], 830 So.2d at 803 (citing Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996)). There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could not find the existence of the elements of the crime beyond a reasonable doubt. See Banks v. State, 732 So.2d 1065 (Fla.1999). "A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Orme v. State, 677 So.2d 258, 262 (Fla.1996).
"The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse." Darling v. State, 808 So.2d 145, 155 (Fla.) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)), cert. denied, 537 U.S. 848, 123 S.Ct. 190, 154 L.Ed.2d 78 (2002). In meeting its burden, the State is not required to "rebut conclusively, every possible variation of events" which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events. Darling, 808 So.2d at 156 (quoting Law, 559 So.2d at 189). Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt. Id.

*265 Johnston, 863 So.2d at 283. The state's evidence must rebut the defendant's allegations and evidence of self-defense beyond a reasonable doubt, or a judgment of acquittal is required. Geffkin v. State, 820 So.2d 331, 335 (Fla. 4th DCA 2002).
A motion for judgment of acquittal must fully set forth the grounds on which it is based. Fla. R.Crim. P. 3.380(b) (2004). A boilerplate motion is insufficient. Woods v. State, 733 So.2d 980, 984-85 (Fla.1999). Thus, a motion which asserts that the state failed to present a prima facie case, without more, is insufficient. See Miller v. State, 712 So.2d 451, 452 (Fla. 2d DCA 1998); Griffin v. State, 705 So.2d 572, 573 (Fla. 4th DCA 1998); see also Cornwell v. State, 425 So.2d 1189, 1190 (Fla. 1st DCA 1983) (stating that a motion which merely alleged that the testimony was "rather ambiguous, vague" was insufficient).
In this case, the state contends that the motion for judgment of acquittal was insufficient as to the count related to Adan's death. The defense attorney stated:
... the only evidence we have of any crime being committed by Mr. Romero is the issue involving Adan Cornejo-Cornejo, which again is circumstantial. He has admitted that he did the shooting but he, uh, basically is setting forth the fact that he believed that he was coming at him. So as to that, I just make a motion as to Adan Cornejo-Cornejo without any argument....
This is insufficient under Woods and the above cited authorities. In any event, the defendant admitted that he shot Adan and that he did not have to do so under the circumstances. He then left the scene, hid the gun, and lied to the police. This evidence creates a jury question.
A closer question is posed by the shooting of Galaciano. The defendant's hypothesis of innocence was that Adan shot Galaciano. The state's theory that the defendant shot Galaciano was based on evidence that: 1) the gun used to kill Galaciano belonged to the defendant; 2) the defendant left the scene, hid the gun, and lied to the police; 3) there were inconsistencies in the defendant's versions of events over time; and 4) an unfired cartridge was found at the scene, indicating that the gun had jammed.
The inconsistencies in the defendant's story included the following: a) appellant initially said that he did not know how Adan obtained the gun but later said that he witnessed Adan remove the gun from underneath the front seat; b) the defendant first said that Adan pulled Galaciano out of the truck in a headlock, but later said that Adan was sitting in the middle and Galaciano got out first to use the bathroom; c) the defendant gave different statements about whether the truck doors were open or closed before Galaciano and Adan got out; and d) the defendant gave different statements about whether he exited the truck before or after Adan shot Galaciano. Further, though the defendant consistently stated that he struck only Adan's head several times with the pipe, the medical examiner found three strikes to the body, in addition to the damage to Adan's face.
The defendant argues that the evidence introduced at trial was not inconsistent with his reasonable hypothesis of innocence that he shot and killed only Adan, and that he did so in self-defense after watching Adan shoot and kill Galaciano. He attributes any false and inconsistent statements during police questioning to his intoxicated state and fear of not being believed.
*266 A case factually similar to this one is Hampton v. State, 549 So.2d 1059 (Fla. 4th DCA 1989). There, the defendant claimed that the victim initially pulled out the gun and that it fired in a subsequent struggle. The defendant gave different explanations in the course of the investigation concerning the details of what caused the gun to discharge. He also made several statements indicating his lack of remorse and his expectation that he would be charged with the shooting. Although the defendant appeared to have been pistol-whipped, there was no clear evidence as to when that happened. No gunshot residue was found on the defendant, while there was residue found on the victim's hand.[1] We concluded:
We are satisfied that the reasonableness of the defendant's version of the case was a question for the jury.... Here, taking the evidence in a light most favorable to the state, there was competent evidence from which the jury could reasonably infer guilt and reject the appellant's explanation of how the shooting occurred.
Id. at 1060-61. Similarly, in this case, there was competent evidence from which the jury could reasonably infer guilt and reject the defendant's version of how Galaciano was killed.

Cross-examination of Galaciano's Widow
During the state's direct examination of Galaciano's widow, the widow testified that her husband and Adan were good friends who never fought or argued. When the defendant attempted to ask her about the relationship between her husband and the defendant, the state objected that it was beyond the scope of direct examination. The trial court agreed and sustained the objection. Defense counsel proffered the widow's testimony that her husband and the defendant were friends. On appeal, the defendant complains that the trial court's ruling improperly curtailed his right to cross-examination.
A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. Johnston, 863 So.2d at 278. In Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982), the Florida Supreme Court reviewed the principles which control the scope of a defendant's right to cross-examination:
The right of a criminal defendant to cross-examine adverse witnesses is derived from the Sixth Amendment and due process right to confront one's accusers. One accused of crime therefore has an absolute right to full and fair cross-examination. Coco v. State, 62 So.2d 892 (Fla.1953). A limitation on cross-examination that prevents the defendant from achieving the purposes for which it exists may be harmful error. The proper purposes of cross-examination are: (1) to weaken, test, or demonstrate the impossibility of the testimony of the witness on direct examination and, (2) to impeach the credibility of the witness.... Therefore it is held that questions on cross-examination must either relate to credibility or be germane to the matters brought out on direct examination.... If the defendant seeks to elicit testimony from an adverse witness which goes beyond the scope encompassed by the testimony of the witness on direct examination, other than matters going to credibility, he must make the witness his own. Stated more succinctly, this rule posits that the defendant may not use cross-examination *267 as a vehicle for presenting defensive evidence.
(citations omitted).
In Stotler v. State, 834 So.2d 940, 943 (Fla. 4th DCA 2003), we stated that to determine the proper scope of a defendant's cross-examination in a criminal case, a court must keep in mind "the expansive perimeters of subject matter relevance which the constitutional guarantee of cross-examination must accommodate to retain vitality." Id. (quoting Coxwell v. State, 361 So.2d 148, 152 (Fla.1978)). In that case, the subject of the witness's direct examination was the commission of a burglary depicted on a silent videotape, which the witness had identified. We held that the trial court erred in preventing cross-examination about what the defendant said to the witness immediately before and during the burglary.
In defining the scope of cross-examination in Coxwell, the court stated:
[W]hen the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts ... or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated, cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief ...
361 So.2d at 151 (quoting Coco v. State, 62 So.2d 892, 894-895 (Fla.1953)).
In Coxwell, the state called a witness who testified to having several conversations with the defendant about killing his wife. On cross-examination, the defense counsel attempted to ask the witness whether he had killed the victim pursuant to any of these plans. The trial court sustained a "beyond the scope" objection. The state argued that its inquiry on direct had been carefully limited to plans discussed prior to the day of the crime. The Florida Supreme Court reversed, rejecting "the state's narrow characterization of the scope of direct examination ..." Id. It added that, "Kilpatrick's abridged testimony concerning his conversations with Coxwell left an accusatory implication which Coxwell was barred from refuting." Id.
Similarly, in this case the widow's testimony left an "accusatory implication," which the defendant was barred from refuting. The jury was aware that appellant, Galaciano, and Adan were together at the cantina and that the latter two were killed shortly after leaving. The state established through Galaciano's wife that Galaciano and Adan were friends, who never fought or argued, but did not inquire about her husband's relationship with the defendant. The gist of the state's direct examination of the widow was who, among the threesome, were on friendly terms. The misleading impression left by the state's direct examination was that Galaciano was friends with Adan, but not with the defendant. The defendant's proposed cross-examination would have modified the state's direct examination by removing this misleading impression. The jury would be more likely to conclude that Galaciano was shot by a person who was not viewed as a good friend than it would be to conclude that he was shot by a good friend with whom he never fought or argued. The limitation placed on the defendant's cross-examination made the defendant, as opposed to Adan, the more likely suspect in Galaciano's death.

State's Closing Argument
The error in excluding testimony about the defendant's friendship with *268 Galaciano was compounded by the prosecutor's comments during closing argument. The state is prohibited from preventing the defense from introducing evidence to the jury and then using the absence of that evidence to strengthen its case for guilt. Garcia v. State, 564 So.2d 124, 128-29 (Fla.1990); Villella v. State, 833 So.2d 192, 197 (Fla. 5th DCA 2002); Reid v. State, 784 So.2d 605, 606-07 (Fla. 5th DCA 2001).
In Garcia, the Supreme Court held that the trial court erred in excluding certain payroll records and that the state "compounded that error" in its closing argument by falsely arguing to the jury that the records did not exist. The court held that this combination of errors denied the defendant a fair trial.
In Villella, the Fifth District reversed the defendant's conviction for first degree murder of his wife, where the state successfully prevented the defendant from introducing corroborative evidence that his wife was having an affair and then argued to the jury that the defense had failed to present any independent evidence of the affair. The court noted that it had condemned such conduct in Reid v. State, 784 So.2d 605 (Fla. 5th DCA 2001), "when it held that the state could not have exculpatory testimony excluded and then argue to the jury that absence of such evidence belied a self defense theory." Villella, 833 So.2d at 197.
In this case, the state successfully excluded the testimony of Galaciano's wife that the defendant and Galaciano were friends, then argued to the jury that it had only the defendant's uncorroborated testimony about their friendship to rely on. This exploitation of the court's erroneous evidentiary ruling violated the rule prohibiting the state from preventing the defense from introducing evidence to the jury and then using the absence of that evidence to strengthen its case for guilt. The state's closing argument suggested that because Galaciano was friends with Adan, but not with the defendant, the defendant, not Adan, must have killed him. We cannot say beyond a reasonable doubt that the combined error in excluding evidence of the defendant's friendship with the victim and allowing the state to comment on the lack of such evidence was harmless. There is a reasonable possibility that this may have played a role in the jury's verdict. We therefore reverse and remand this cause for a new trial. As to all other issues raised by appellant in this appeal, we find them to be without merit.
Reversed and Remanded.
GUNTHER and STONE, JJ., concur.
NOTES
[1] There was no mention below of the presence or absence of gunpowder residue on Adan's hands, indicating that they were not tested. This, despite the fact that the defendant told police his version of events within twenty-four hours of the crime.