901 So.2d 344 (2005)
Leonard MINUS, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-3942.
District Court of Appeal of Florida, Fourth District.
May 4, 2005.
*346 Carey Haughwout, Public Defender, and Louis G. Carres, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and David M. Schultz, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
Leonard Minus appeals his convictions of kidnapping, sexual battery, and burglary of a conveyance, as well as his resulting life sentence. Because of numerous evidentiary errors that prevented Minus from establishing his defense of consent and the lack of credibility of the complaining victim, his long-time girlfriend, Minus did not receive a fair trial. We reverse.

I. Facts
The charges against Minus arose out of an incident involving Minus and his girlfriend of seven years, T.B. They had been dating since T.B. was fourteen. The relationship progressed to the point of sexual activity after about three years. T.B.'s mother did not like Minus and disapproved of the relationship. T.B. claims she broke off the relationship in November 2001, approximately two months before the incident in this case, because Minus was typically angry and had mood swings. All contact between Minus and T.B. did not cease, however. She met Minus on his birthday, December 5th, and took him to the mall in Vero Beach. She explained that she did this out of friendship because she felt sorry for Minus, as he had issues with his mental health and was placed on medication. She also gave Christmas gifts to Minus and his parents that year.
On New Year's Day 2002, T.B. called Minus from New York. She did this after she called her mother who complained that Minus had been calling the mother's house looking for T.B. T.B. asked Minus to stop calling her mother's house. Five days later, on T.B.'s birthday, she went to Minus's home for a birthday celebration with his family. After they had cake, Minus took T.B. out to dinner.
Because T.B.'s mother did not like Minus, T.B. did not tell her about all the times she saw Minus. T.B. did not remember telling her mother about the December meeting, nor did she tell her mother that she called Minus on New Year's Day or had dinner with him on her birthday. T.B.'s mother did not allow Minus in her home and she pressed harassment charges against him because he was constantly calling her home.
On January 7, two days after T.B.'s birthday, Minus called T.B. to find out where she would be parking at the community college the next day. T.B. testified she did not tell Minus where she planned to park. When she went to school the next day, T.B. left the doors of her parked car unlocked. When she returned to her car after classes, Minus was sitting in the passenger seat. T.B. told him to get out of her car and he refused. T.B. told Minus that she needed to use the restroom, and *347 he jumped out of the car to accompany her.
As they walked to the administration building, they passed a security guard, but T.B. did not alert him that anything was wrong as she did not think he could help her. Minus allowed her to enter the administration building, where T.B. asked the receptionist to call 911 because a man was following her. The receptionist saw Minus but dispatched security instead of calling 911.
T.B. walked to the bathroom with Minus following her. She testified that Minus entered the bathroom and dragged her out of the stall. Minus then walked her back to the car, as T.B. kept yelling for him to leave her alone.
Two witnesses saw T.B. and a man having a confrontation as they walked to the car. They both thought that the woman appeared to be afraid of the man. One of the witnesses alerted security.
T.B. testified that Minus forced her into her car and ordered her to drive him home. While she was driving, he directed her to drive to a location off a dirt road where they parked. Minus told T.B. to get into the back seat and take her clothes off. She started to cry, and he proceeded to hit her in the back of the head and choke her. He began to have sex with her, which lasted for hours. At one point, Minus threatened T.B. with the sharp edge of a bottle cap. A bottle cap was not inventoried by the police when the car was searched.
Eventually, T.B. told Minus that she was hungry. She got dressed, and they drove out of the area. Minus gave her directions to reach his house from the secluded area where they had been parked. When they were near Minus's house, police spotted T.B.'s car because they had been looking for her. Several police cars began to chase them. When T.B. thought the police were close enough that she felt safe, she stopped the car, jumped out, and ran to the officers. The officers said she was very upset when they approached.
T.B. was taken to the emergency room. She testified that she had bumps on her head, a mark on her neck, and a scratch and bruise on her back. She did not have any vaginal bruising or any bruising on her face. Her mother testified that she observed bruising on T.B.'s back and red hand prints around her neck, and one of the officers testified that she saw bruises on T.B.'s back. No other evidence of T.B.'s injuries was admitted.
Minus testified in his own defense, and, needless to say, his version of events was substantially different. He testified that on the day of the incident he and T.B. were to discuss their relationship. T.B. told him where she would park her car and gave him permission to wait in her car. Minus admitted waiting for her while she went to the restroom but denied dragging her out. He did not force T.B. into the car with him. When they got to the secluded area, T.B. agreed to have sexual intercourse with Minus. They stayed there three to four hours before T.B. drove Minus home. When the police began to follow them, Minus told T.B. to get out of the car and find out what was going on. After this occurred, he was arrested and taken to the police station.
Minus testified that he and T.B. did not break up in November 2001; they were still dating at the time of the incident. He claimed this was evidenced by T.B. continuing to visit him and give him gifts. T.B. gave Minus a teddy bear for his birthday, took him to the Vero Beach Mall, and went with him to see his friends. The trial court admitted the bear into evidence but ruled the note attached to the bear was inadmissible. T.B. also gave Minus a teddy *348 bear for Christmas. The note attached to that bear was also not admitted. On T.B.'s birthday, she and Minus had sex in her car behind a house in the neighborhood. According to Minus, he and T.B. had sex in her car more times than he can count, and each time it was consensual. After presentation of all of the evidence, the jury convicted Minus of all charges, and the court sentenced him to life in prison. He appeals his convictions and sentences.

II. Analysis
The standard for the admission of evidence that a criminal defendant seeks to admit to show bias or prejudice, or to attack the credibility of a testifying witness, is broader than that of a civil defendant because of the defendant's Sixth Amendment rights. See Mitchell v. State, 862 So.2d 908, 912 (Fla. 4th DCA 2003); Barows v. State, 805 So.2d 120, 122-23 (Fla. 4th DCA 2002). As we explained in Jones v. State, 577 So.2d 606 (Fla. 4th DCA 1991):
In Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), it was held that "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." 415 U.S. at 316, 94 S.Ct. at 1110. "The right to elicit facts tending to show bias or prejudice of a witness becomes even more important to a defendant in a criminal case ... where the jury must know of any improper motives of a prosecuting witness in determining that witness' credibility." Brown v. State, 424 So.2d 950, 955 (Fla. 1st DCA 1983). It is settled in this court that, for the purpose of discrediting a witness, a wide range of cross-examination is permitted as a matter of right in regard to his motives, interest, or animus as connected with the cause or the parties thereto.... Morrell v. State, 335 So.2d 836, 838 (Fla. 1st DCA 1976).
577 So.2d at 608-09.
During the course of the trial, the court refused to permit Minus's counsel to cross-examine T.B. on her sexual relationship with Minus; refused to permit Minus to examine T.B.'s mother on why T.B. moved out of the home for a period of time; refused to permit evidence of two other incidences in which T.B. claimed Minus raped her, which were not reported until after the incident in question; and refused to admit letters and notes written by T.B. to Minus and the trial judge, which refuted some of her testimony at trial or was further proof of bias and motive. The theory of the defense was that the sexual intercourse was consensual, as T.B. was still Minus's girlfriend at the time of the incident and was pregnant with a child he fathered. She lied about the incident because of her mother's dislike for Minus and demands that T.B. disassociate with him. The court's actions substantially undermined this defense and prevented the defense from exposing T.B.'s motivation for testifying as well as attacking her credibility. Although we discuss each evidentiary error separately, they all relate together to support the defense.

A. Evidence of prior sexual relationship between T.B. and Minus.
The court refused to permit the defense to cross-examine T.B. about the sexual nature of her prior relationship with Minus, stating that it was not relevant.[1] "All relevant evidence is admissible, except *349 as provided by law." § 90.402, Fla. Stat. (2001). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2001). This rule of relevance as it applies in cases of sexual battery is codified in the rape-shield statute, section 794.022(2), Florida Statutes (2001). Kaplan v. State, 451 So.2d 1386, 1387 (Fla. 4th DCA 1984). That section states:
Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution [for sexual battery]. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.
§ 794.022(2) (emphasis added). "[T]he defendant's right to full and fair cross-examination, guaranteed by the Sixth Amendment, may limit the statute's application when evidence of the victim's prior sexual conduct is relevant to show bias or motive to lie." Kaplan, 451 So.2d at 1387-88 (citing Commonwealth v. Joyce, 382 Mass. 222, 415 N.E.2d 181 (1981); State v. Jalo, 27 Or.App. 845, 557 P.2d 1359 (1976)); see also Michigan v. Lucas, 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) ("Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence `may not be arbitrary or disproportionate to the purposes they are designed to serve.'"). The evidence of T.B.'s prior sexual relationship with Minus is not made inadmissible by the rape-shield law because it involves claims of prior sexual conduct between the victim and the alleged perpetrator, not a third person. Their prior sexual relationship would also be relevant to the issue of consent.

B. Evidence of mother's refusal to permit T.B. to live in home while her relationship with Minus continued.
T.B.'s mother testified on direct examination that T.B. broke off her relationship with Minus in November 2001. The mother admitted that she never liked Minus, and pressed harassment charges against him because he continuously called her house at inappropriate times. On cross, T.B.'s mother testified that T.B. moved to a friend's home for a period of time during 2001. Defense counsel asked the mother why her daughter moved, and the state objected to the question on the ground of relevance.
On proffer, the mother explained why T.B. moved. One day the mother came home to find Minus there with T.B. The mother was angry that Minus was in her home and told T.B. that "she could leave if she had to have him around." The trial court sustained the state's objection, finding the evidence was not relevant.
The evidence of the mother's anger and her refusal to have T.B. live at home is relevant to show a bias or motive for T.B.'s allegations of sexual battery against Minus. We held in Jones that the trial court erred when it prevented a defendant from challenging the victim's motive for accusing him of sexual battery by questioning her about her relationship with her family. In Jones, the defendant "sought to show that the victim's family had refused to support her throughout her recent pregnancy." 577 So.2d at 609. We found this *350 evidence of the family relationship would be relevant to her motivation to lie about another sexual relationship. Id. We reversed and remanded for the trial court to explore the victim's possible bias or motive in this area. Id.
In the instant appeal, Minus sought to demonstrate that T.B.'s relationship with her mother gave her a motive to lie about Minus sexually battering her. The mother did testify that she did not like Minus and did not want her daughter dating him, but Minus was not permitted to elicit testimony that the mother disliked Minus to such an extent that she was willing to kick her daughter out of the house. As in Jones, Minus should have been permitted to explore this area of T.B.'s possible motive or bias.

C. Evidence of T.B.'s allegations that Minus raped her on prior occasions.
During cross-examination of T.B. and her mother, Minus sought to introduce evidence that T.B. made allegations that he raped her on two occasions prior to the incident for which he was being tried. T.B. filed a petition for an injunction against Minus after the January 8, 2002 incident for which he was being tried, in which she alleged that Minus previously raped her in August 2001, several months before the date that T.B. claimed to have ended their relationship. She also testified in deposition that Minus raped her on December 21, 2001, one month after their relationship ended. The state objected that this evidence was not relevant to the issue of whether Minus committed the sexual battery for which he was being tried. The defense argued that this evidence was relevant as it was damning to T.B.'s credibility; although Minus allegedly raped her on more than one occasion, she continued to spend time with him and buy him gifts. From this information, the defense claimed, it could be inferred that the prior rape allegations were false, intimating that the current allegation is also false. The defense argued that the rape-shield law does not render this evidence inadmissible. The court found T.B.'s allegations that Minus had previously raped her were not relevant.
As noted in the statute and in Kaplan, section 794.022 does not make this evidence inadmissible. We conclude that these allegations go both to the bias and credibility of T.B. as well as to the issue of consent. The court erred in refusing to permit cross-examination on this issue. See Jones, 577 So.2d at 608-09. T.B. admitted at trial that her romantic relationship with Minus did not end until November, months after one of the alleged incidences of sexual battery, which was not reported until after this incident. She also testified that she continued to see Minus even after their break-up, accompanying him on a shopping trip, giving him a Christmas present four days after the second alleged rape, and then celebrating her birthday with him a week later. The evidence of T.B.'s allegations that Minus raped her on prior occasions is inconsistent with her continued relationship with him after those incidents and is material to the issue of consent, as well as her credibility.

D. Evidence of letters written by T.B. to Minus and the trial judge.
Minus sought to introduce two letters written by T.B. into evidence. The first letter was sent to him, and reads:
Leonard,
How are you? I hope your [sic] doing fine. I don't know how you feel, but I feel that I need to let you know something straight from my heart. Leonard I forgive you for everything you did to *351 me. And I pray that you can forgive me for what I did, and I just want you to get a lot of help in jail. I'm sorry you are staying there, but at least you are taking your medicine so you can get better.
I know that you were going through a lot of stress that day you came to the college, and I understand what you were talking about now when you asked me why I did it. I would have been angry too.

Keep your head up Leonard, you have a lot of family that love you. Your life is in God's hands even though it seems like the devil has won. But he hasn't! Trust in Jesus okay.
The baby will be here soon! The doctor says he will be close to 9lbs. I saw h[i]s picture on the ultra sound. He's very beautiful.
Sometimes I miss talking to you. You've always been my best friend. And after you get better, I'll be there for you. But right now just think about getting better because you REALLY scared me when you weren't taking your medicine. I'll be praying for you.
[T.B.]
P.S. You can tell your mom about this letter, but don't tell anyone else because I don't know if I'm suppose[d] to be writing you until the trial is over.
(Emphasis added in first two paragraphs). The second letter was sent to the court:
Dear Judge Dwight L. Geiger,
My name is [T.B.]. I am in a case with Leonard Minus. I'm writing you to let you know that I feel very confused and worried about the outcome of the trial.
Basically, I've been through a lot, and right now I need to consintrate [sic] on my new baby!
So, I am requesting that you would understand if I can't go to trial.
I know for a fact that Leonard Minus was not in his right mind due to schizophrenia and his lack of medication on the day of January 8, 2002.
Therefore, I do not want to prosecute or go to trial with him. I'm sure that I will be safe due to the protection of the permanent restraining order I have against him.
I really can not go through with the prosecution knowing that there is a very good chance Leonard Minus did not know right from wrong due to the illness he has (schizophrenia) that can sometimes separate him from reality. Also, I do not feel that the trial will make me feel any better, but in fact, it would put me through more emotional drama than I can bare [sic].
I feel that I have been pressured to continue the prosecution by friends and family when this is not what I want to do.
Please accept my request so that I can be relieved of this stress and confusion. Thank you so much.
 Sincerely,
 [T.B.]
(Emphasis added).
Minus argues the court should have allowed the admission of these letters into evidence because they are inconsistent with T.B.'s allegations against him and could have been used to impeach her testimony. In her letter to Minus, T.B. asked him to forgive her for what she did and stated that she understood why Minus would have been upset with her actions. These statements intimate that T.B. may have accused Minus of rape in order for him to get help for his problems in jail. The letters also support Minus's theory of defense that his relationship with T.B. was *352 not completely over as she claimed, but he remained her "best friend" and she planned to stay involved in his life. This could qualify as an impeachment with a prior inconsistent statement. See § 90.608(1), Fla. Stat. (2001). In her letter to the judge, T.B. admits that she was pressured to continue the prosecution by her family, which is consistent with the defense theory of her motive for making the allegations against Minus. And, certainly, these letters are relevant to the issue of T.B.'s credibility. The trial court should have admitted them into evidence.

E. Evidence of note written by T.B. to Minus.
During cross-examination, T.B. testified that she gave Minus teddy bears for his birthday and for Christmas. She did not recall whether she attached a note to the Christmas teddy bear. Defense counsel asked whether that bear had a note that read, "To my first love?" The state objected and the trial court sustained the objection that the note was hearsay, without giving defense counsel the opportunity to respond to the objection.[2] The note on the Christmas bear was later proffered, and in the preprinted To/From fields, T.B. had written "My 1st Love" and "Your 1st Love," respectively. This note was offered to impeach T.B.'s testimony that her relationship with Minus had ended. As such, it could be used for impeachment. See Breedlove v. State, 413 So.2d 1 (Fla.1982) ("Merely because a statement is not admissible for one purpose does not mean it is inadmissible for another purpose.") See also Dias v. State, 812 So.2d 487, 495 (Fla. 4th DCA 2002) ("statement can be admitted as impeachment although it would constitute hearsay if offered as such for impeachment purposes.") This statement qualifies as a prior inconsistent statement under section 90.608(1). The court should have permitted T.B. to be cross-examined on the note.
In all, the evidentiary rulings in this case cumulatively undercut any defense Minus had. There was substantial evidence showing T.B.'s bias and motivation to testify falsely. There was evidence that T.B. lied. There was substantial evidence to support a consent defense. Yet the court excluded all of it. Because the evidentiary rulings prevented Minus from presenting his defense, the trial was not fair.
Reversed and remanded for a new trial.
POLEN and HAZOURI, JJ., concur.
NOTES
[1] Although the state's brief argues that evidence was not proffered, the record contains the deposition of T.B. in which she readily admits a continuing sexual relationship, giving details similar to what Minus testified to.
[2] Contrary to what the state says in its brief, defense counsel tried to respond to the state's objection, but the court cut him off and did not allow him to speak to the objection.