929 So.2d 1139 (2006)
Rick G. DOCEKAL, Appellant,
v.
STATE of Florida, Appellee.
No. 5D04-3881.
District Court of Appeal of Florida, Fifth District.
June 2, 2006.
*1140 Benjamin S. Waxman, of Robbins, Tunkey, Et Al., Miami, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Jeffrey R. Casey, Assistant Attorney General, Daytona Beach, for Appellee.
THOMPSON, J.
The State charged Rick Docekal with committing sexual battery on a victim while she was physically helpless to resist.[1] The jury found Docekal guilty of the lesser included offense of sexual battery.[2] Docekal filed motions for judgment of acquittal or new trial, which the court denied. He timely appeals, arguing four issues. He contends the trial court erred by: (1) limiting his cross-examination of the victim; (2) denying his motion for mistrial after the State made an improper comment in closing; (3) denying his motion for judgment of acquittal; and (4) imposing victim injury points for sexual penetration. We determine that the first issue is dispositive and hold that the trial court abused its discretion by limiting Docekal's cross-examination; therefore, we reverse for a new trial.
Docekal met the victim at a Sterling Jeweler's annual convention involving more than 1500 managers at the Coronado Springs Resort in Orlando. The convention lasted four days and consisted of daily seminars and social events. It ended on a Thursday. Sterling paid for transportation, meals, beer, wine, a company party at MGM Studios, and double rooms. The record is unclear whether the double rooms were to save costs or to develop a spirit of camaraderie among the participants.
*1141 Docekal was 40, married, wore his wedding band, and had attended several conventions. The victim was 25 and single. She was attending her first convention and shared a room with fellow manager Wendy Kreitzer. During the convention, the victim spent time with Kreitzer and two other Ohio managers, Nicole Feltner and Feltner's roommate. On Sunday night, Docekal approached the four women at the resort bar and flirted with them for approximately 15 minutes. However, he focused his attention on Feltner. The victim immediately disliked Docekal. She tuned him out because she considered him a slimy, arrogant ladies' man, and was "creeped out" by him. During the convention, Docekal periodically encountered the women. The victim testified she considered him "that annoying guy that keeps coming up and will not leave you alone."
The party on Wednesday began around 8:00 p.m. and ended around midnight. The amount of alcohol Docekal and the victim consumed that night was disputed; however, all witnesses testified that alcohol was served and consumed. The convention ended the following day, and everyone had to be out of their rooms by 7:15 a.m. Thursday morning. After the party ended, Feltner and Docekal talked alone for an hour by the hotel pool. Docekal wanted to spoon[3] with Feltner and sleep in her room because his roommate snored. Feltner changed the subject because Docekal was married, and they decided to go to the victim's room to see if she and her roommate were still awake.
Docekal and Feltner arrived at the victim's room between 1:30 a.m. and 3:00 a.m. The victim's roommate, Ms. Kreitzer, turned on the light and answered the door. The victim had been asleep and remained in bed under the covers. Feltner and Docekal chatted for about fifteen minutes. Docekal complained about his snoring roommate and talked about spooning with Feltner. Eventually, Feltner and Docekal left, and the victim went back to sleep. Docekal went to Feltner's room and still wanted to spoon, but Feltner declined and pushed him out the door. About 15 minutes later, Docekal returned to the victim's room.
The victim awoke, and Kreitzer let him in. Docekal plopped onto the victim's bed and announced he was sleeping there. She told him to stay on top of the covers on his side of the bed. She had nothing on under the covers so she scrambled around, not getting out of bed, to put on and tie a pair of drawstring pants over her underwear and a tank top while she was under the covers because, "[b]eing the slimy individual that [she] perceived him to be, [she] [thought] that if he recognized ... that [she] did not have clothing on, he would do, in fact, what he did." She got under three layers of covers and immediately fell asleep; he was clothed and on top of the covers.
At this point, their accounts of the subsequent events diverge. The victim testified that she awoke about an hour later and Docekal's hand was on her hip while he penetrated her from behind. She thought she was dreaming that she was with her boyfriend back home. One or two seconds later, after moments of shock and disbelief, she realized where she was. She kicked and pushed Docekal and said, no, you have to move over. Her pants and underwear were around her knees, but she did not recall how they got there. She pulled up her pants, laid still for one minute, *1142 flipped on the light, and told Docekal to leave. She heard his pants come up and the door shut. After another minute, she woke Kreitzer,[4] told her what happened, and cried in bed. She remained in bed until she called her district manager and the police around 7 a.m., approximately three hours after the incident. She testified she did not consent to or invite Docekal's conduct.
Docekal testified that, about an hour after falling asleep on top of the covers, he got up to use the bathroom. He got under the covers when he returned because the room was cold, but he still had his clothes on. Moreover, he testified the victim caressed his ankle with her foot, and they began to kiss and engage in foreplay. She unbuttoned his shorts and touched his penis, and he pulled her pants and underwear down to her ankles. He digitally penetrated her vagina, but he was flaccid. He was rubbing his groin against her from behind when she said, no, you need to get back on your side of the bed. He complied. After a few minutes, she told him to leave, and he did.
At trial, the State asked the victim during direct examination why she let Docekal stay in her room. She responded:
He was back a second time, I was tired, I wanted to go to sleep. It was apparent he wasn't leaving. Being that he's a married man, you wouldn't have expected any  to be in harm's way. And the fact that he was employed with the company, he should have been a respected individual, acting in a responsible manner. I just wanted to go to sleep.
On cross-examination, Docekal attempted to question the victim about her sexual relations with another married man on the day before the alleged sexual battery, but the State objected. Docekal contended he was entitled to impeach her credibility because she said that she would not expect a married man to make advances. The State replied that Docekal was attempting impeachment on a collateral, irrelevant matter elicited during cross-examination. The court sustained the objection. In a proffer, Docekal stated he would have asked whether she had sexual relations with a married man on the previous day.
Docekal argues that the court erred by limiting his cross-examination regarding the victim's sexual relations with another man on the night before the alleged rape. The State responds that Docekal, not the State, opened the door, and that the matter was irrelevant. In light of the victim's testimony on direct examination that a married man would not place her in harm's way, we agree with Docekal.
We review the trial court's ruling concerning the scope of cross-examination for abuse of discretion. De la Portilla v. State, 877 So.2d 871, 874 (Fla. 3d DCA 2004). The defendant has the absolute right to conduct a full and fair cross-examination. Id. (citing Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982)). This right "is especially necessary when the witness being cross-examined is the key witness on whose credibility the State's case relies." Tomengo v. State, 864 So.2d 525, 530 (Fla. 5th DCA 2004). A trial court reversibly errs by prohibiting cross-examination "when the facts sought to be elicited are germane to that witness' testimony and plausibly relevant to the theory of defense." Bertram v. State, 637 So.2d 258, 260 (Fla. 2d DCA 1994) (citation omitted); De la Portilla, 877 So.2d at 874. Such an error occurred here.
The proper purposes of cross-examination are: (1) to weaken, test, or demonstrate the impossibility of the testimony *1143 of the witness on direct examination and, (2) to impeach the credibility of the witness, which may involve, among other things, showing his possible interest in the outcome of the case. Therefore it is held that questions on cross-examination must either relate to credibility or be germane to the matters brought out on direct examination.
Steinhorst, 412 So.2d at 337 (citations omitted) (quoted in Diaz v. State, 747 So.2d 1021, 1023 (Fla. 3d DCA 1999); see also Romero v. State, 901 So.2d 260, 266-67 (Fla. 4th DCA 2005)).
Docekal was entitled to impeach the victim's credibility. "All [testifying] witnesses ... place their credibility in issue.... [A] party on cross-examination may inquire into matters that affect the truthfulness of the witness' testimony. Although cross-examination is generally limited to the scope of the direct examination, the credibility of the witness is always a proper subject...." Chandler v. State, 702 So.2d 186, 195 (Fla.1997) (quoting Charles W. Ehrhardt, Florida Evidence § 608.1 at 385 (1997 ed.)); see also Minus v. State, 901 So.2d 344, 348 (Fla. 4th DCA 2005) (noting the breadth of the defendant's right to attack the credibility of a testifying witness in a criminal case). Furthermore, the supreme court has "long held that cross examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut, or make clearer the facts testified to in chief." Chandler, 702 So.2d at 196 (citations and internal quotation marks omitted).
On direct examination, the victim justified her decision to allow Docekal to sleep in her bed with an explanation that was tenuous in light of her conduct on the previous night. The misleading impression left by the State's direct examination was that she did not believe that a married man would initiate a sexual encounter with her. See Romero, 901 So.2d at 267. Docekal's proposed cross-examination would have modified the State's direct examination by removing this misleading impression. See id.
Even if the testimony would have been otherwise impermissible, the State opened the door to the testimony. The State's argument that Docekal opened the door is unavailing; when the victim stated she did not expect to be "in harm's way," a juror would conclude she referred to sexual advances. Thus, Docekal correctly notes "the concept of opening the door[,] [which] allows the admission of otherwise inadmissible testimony to qualify, explain, or limit testimony or evidence previously admitted." Rodriguez v. State, 753 So.2d 29, 42 (Fla.2000) (citations and internal quotation marks omitted). This concept is "based on considerations of fairness and the truth-seeking function of a trial." Id. In light of her direct testimony and sexual relations with a married man on the night before the alleged rape, the court hampered the trial's truth-seeking function by prohibiting Docekal's cross-examination and, accordingly, abused its discretion.
The victim's credibility was critically important in this "classic swearing match," and the trial court's failure to permit Docekal's cross-examination cannot be considered harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986); Davis v. State, 527 So.2d 962, 963 (Fla. 5th DCA 1988).
The court's limitation of Docekal's cross-examination requires reversal, so we need not address his other arguments. Nevertheless, we address Docekal's third argument to clarify that, under State v. Lalor, 842 So.2d 217, 219-20 (Fla. 5th DCA 2003), the State presented testimony that was *1144 legally sufficient to preclude judgment of acquittal.
Because the trial court erred by limiting Docekal's cross-examination of the victim, where the victim claimed that she allowed Docekal to sleep in her bed because she would not be placed in harm's way by a married man, we reverse and remand for a new trial.
REVERSE and REMAND for a new trial.
MONACO, J., concurs.
GRIFFIN, J., dissents, with opinion.
GRIFFIN, J., dissenting.
I respectfully dissent.
The question is whether the defense should have been able to inquire about the victim's consensual sexual encounter (apparently consisting of oral sex) with a married man the night before she had the misfortune to endure the indisputably boorish and apparently criminal behavior of the defendant. The prejudicial effect of allowing such evidence is manifest; the question is whether the probative value justified allowing the evidence. The majority says that the judge had no discretion in the matter  that he was obliged to allow the inquiry on cross-examination because the victim had testified that she did not expect a married man to make (unwanted) sexual advances.[1] I guess I'm dense, but I cannot see what the one has to do with the other. If the defendant had evidence that, the night before, this woman had been a victim of a sexual assault by a married man, I can at least see some impeachment value and maybe (though not really) not on a wholly collateral matter. But to say that by engaging in oral sex the evening before with a married man, she opened herself up to impeachment on the question whether she did not expect a sexual assault from a married man, is to ignore the difference between affection, or, even lust  and violence. The trial court was well within its discretion to disallow the question. This judgment should be affirmed.
NOTES
[1] § 794.011(4)(a), Fla. Stat. (2003).
[2] § 794.011(5).
[3] Lying in an embrace with each person on his or her side, and one person's chest to the other's back.
[4] Kreitzer did not testify during the trial.
[1] Florida's Rape Shield statute, section 794.022, Florida Statutes (2005), prohibits introduction into evidence of specific instances of prior consensual sexual activity between the victim and any person other than the offender except in two instances: (1) if the evidence may prove that the defendant was not the source of the semen, pregnancy, injury or disease; or (2) if the evidence tends to establish a pattern of conduct on the part of the victim that is so similar to the conduct in this case that it is relevant to consent. Neither of these exceptions was established below and neither has been relied on.

The cases do recognize a third (constitutional) exception, where, under the unique facts of a given case, what is usually irrelevant (i.e. prior sexual conduct of the victim) becomes relevant to establish the defendant's defense. This usually involves a defendant's claim that the other sexual relationship shows a motive on the part of the putative victim to fabricate the charge or to establish bias. See Kaplan v. State, 451 So.2d 1386, 1387 (Fla. 4th DCA 1984). Here, nothing about the victim's consensual sexual conduct on the prior evening is relevant to the defendant's consent defense. This is not a case where protection of the defendant's Sixth Amendment constitutional rights is implicated; this is an ordinary, garden variety impeachment issue. Under the law of impeachment, the trial court was vested with wise discretion to allow or not to allow the cross-examination. In my view, the trial court certainly had the discretion to deny this cross-examination.