# Third District Court of Appeal
## State of Florida

Opinion filed December 22, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-1581
Lower Tribunal No. F16-21185
_____

**Nimer Abdallah,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Marisa Tinkler Mendez, Judge.

Law Offices of Kawass, P.A., and Kristen A. Kawass, for appellant.

Ashley Moody, Attorney General, and Gabrielle Raemy Charest-Turken and Ivy R. Ginsberg, Assistant Attorneys General, for appellee.

Before LOGUE, SCALES and LOBREE, JJ.

On Motion for Issuance of a Written Opinion

SCALES, J.

We deny appellant Nimer Abdallah's motion for rehearing, but grant his motion seeking issuance of a written opinion, withdraw our unelaborated per curiam affirmance of June 30, 2021, and substitute the following opinion in its place.

Abdallah appeals his criminal conviction of two counts of sexual battery enhanced by specified circumstances and one count of burglary with assault and battery. Specifically, Abdallah argues that the trial court erred by denying his motions for judgment of acquittal and his request for a special jury instruction, and by making several evidentiary rulings. Because we find no reversible error, we affirm.

**I. Background**

*A. The Alleged Crimes*

On Friday October 14, 2016, K.N. and her friend, Adriana, each consumed one alcoholic drink in K.N.'s Miami apartment. They then took an Uber to a restaurant in Coral Gables. They sat at the restaurant's bar and had more drinks. After having a disagreement with the bartender, and feeling bothered by two men at the bar, the two women retreated to the bathroom. There, K.N. started to feel woozy and sick. When they emerged from the bathroom, they sat on some stools at the restaurant's outside seating area.

2

Almost immediately, K.N. fell off the stool and hit her head. From that point onward, she had no recollection of that night.

The restaurant manager told them to leave and, apparently, summoned an Uber using K.N.'s phone. Abdallah was the Uber driver. After he arrived at the restaurant, Abdallah was initially reluctant to drive K.N. and Adriana, concerned that they were intoxicated and might vomit in his car. Eventually, though, Abdallah agreed to drive the two women back to K.N.'s apartment.

When they arrived at K.N.'s apartment, the women had trouble getting out of Abdallah's car and, upon finally emerging from the car, K.N. laid on the sidewalk. Abdallah agreed to assist K.N. from the sidewalk to her apartment. Accompanied by Adriana, Abdallah carried K.N. to an elevator and then into her apartment. Abdallah had K.N.'s key fob for entry to both K.N.'s apartment building and her unit, though neither K.N. nor Adriana could recall how he came to possess it. Surveillance video showed the three of them at the exterior of the apartment building and their entry into the building and its elevator. The elevator video showed Abdallah propping up K.N. while Adriana stood apart from them. The video surveillance showed that eight to nine minutes elapsed between Abdallah's entry into the elevator with the two

3

women and his eventual departure alone. What occurred during those eight to nine minutes is disputed.

In his sworn statement to police, Abdallah admitted to having a sexual encounter with K.N. in her bedroom. Specifically, he admitted that he had both digitally penetrated and touched his penis against K.N.'s vagina. He insisted that the encounter was consensual, initiated by K.N. kissing him. In her testimony, Adriana described the events in K.N.'s apartment differently. She testified that Abdallah carried an incoherent K.N. into the bedroom and placed K.N.'s limp body on her bed. Instead of leaving, Abdallah stood over K.N. Adriana did not see K.N. kiss Abdallah or give him any invitation. Adriana testified that she told Abdallah to leave, and Abdallah responded by pulling her arm and telling her to join him and K.N. Adriana fled the room and locked herself in the bathroom, where she blacked out. Because K.N. was unable to recall any of the evening's events occurring in her apartment, she could not rebut, at trial, Abdallah's version of events.

The next morning, a Saturday, K.N. stirred awake and was confused about why she was in bed and partially naked. She found Adriana in the living room. Together, they tried to recall the previous evening, and found the Uber call and a reference to Abdallah on K.N.'s phone. After Adriana left K.N.'s apartment, K.N. found semen stains on her comforter; DNA testing later

4

matched them to Abdallah.[1] The Monday morning following the incident, K.N. went to a rape treatment center for examination.

*B. K.N.'s Settlement of a Civil Suit against Uber*

The day after the alleged sexual assault, and before K.N. went to the rape treatment center, K.N. contacted Uber. About a year later, K.N. participated as a plaintiff in a federal class action civil lawsuit against Uber filed in California. The plaintiffs were Uber passengers who had suffered alleged sexual assaults or sexual harassment by Uber drivers. The parties entered into a confidential settlement agreement before the start of Abdallah's criminal trial. K.N. did not sue Abdallah civilly.

*C. The Charges*

A month after the incident, the State charged Abdallah with two felony counts: (i) violating section 794.011(4)(b) of the Florida Statutes by his digital penetration and/or digital union with K.N.'s vagina; and (ii) violating section 794.011(4)(b) by his penile penetration and/or penile union with K.N.'s vagina. Both of these sexual battery counts were charged with special circumstances enhancements based on K.N.'s alleged physical helplessness (under section 794.011(1)(e)) and physical incapacitation (under section 794.011(1)(j)). In an amended information, the State added a

---

[1] The parties entered the DNA match into evidence by stipulation.

5

felony burglary charge of violating section 810.02 of the Florida Statutes by entering and then remaining in K.N.'s apartment with the intent to commit sexual battery.

*D. Trial, Motions for Judgment of Acquittal, Verdict and Sentence*

Abdallah's criminal trial was conducted in May of 2019. While Abdullah did not testify, his recorded statement to police was entered into evidence and played to the jury. During the trial, Abdallah made a motion and a renewed motion for judgment of acquittal as to all three counts. The trial court denied both motions. Ultimately, the jury found Abdallah guilty of all three charges and the trial court sentenced Abdallah to 170.25 months in prison, followed by ten years of probation. Abdallah timely appealed.

**II. Analysis**

Abdallah raises five separate issues on appeal.[2] We address each in turn.

*A. Denial of motions for judgment of acquittal[3]*

---

[2] Abdallah also asserts that he was denied a fair trial based on the cumulative effect of the trial court's alleged errors. Because we conclude the trial court did not reversibly err on any ground, we do not separately address Abdallah's "cumulative effect" issue.

[3] We review *de novo* a trial court's denial of a motion for judgment of acquittal. Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). We are compelled to affirm a trial court's denial of a motion for judgment of acquittal if each element of the crime is supported by competent, substantial evidence

Abdallah first asserts that the trial court erred by denying his motions for judgment of acquittal. Abdallah argues that the State failed to establish, with competent, substantial evidence each element of the charged crimes. We first address the two sexual battery counts, then the related burglary charge.

1. The sexual battery charges – section 794.011(4)(b)

    a. The relevant statute – elements of the crime

Section 794.011(4)(b) of the Florida Statutes provides, in relevant part: "A person 18 years of age or older who commits sexual battery upon a person 18 years of age or older without that person's consent, under any of the circumstances listed in paragraph (e), commits a felony of the first degree[.]" § 794.011(4)(b), Fla. Stat. (2016).[4] The referenced paragraph (e) contains a schedule of seven specified circumstances that relate to and enhance the charge, making it a first-degree felony. In this case, the State

_____

presented in the State's case. Id. ("If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.").

[4] "'Sexual battery' means oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual battery does not include an act done for a bona fide medical purpose." § 794.011(1)(h), Fla. Stat. (2016).

alleged that K.N. was both "physically helpless to resist" and "physically incapacitated," thus implicating, respectively, the special circumstances described in subsections 794.011(4)(e)1. and 6.

Hence, the elements of a sexual battery pursuant to section 794.011(4)(b) are as follows: (i) a sexual battery as defined by section 794.011(1)(h); (ii) the act was not consented to; and (iii) as relevant here, the victim was either "physically unable to resist" or "physically incapacitated," as defined in sections 794.011(1)(e) and (j). See Coley v. State, 616 So. 2d 1017, 1019 (Fla. 3d DCA 1993). The trial court incorporated these elements in its jury instructions.[5]

Abdallah asserts that the State failed to adduce evidence that K.N. was either physically helpless or physically incapacitated; Abdallah also argues that K.N. consented. Conceding that K.N. was inebriated, Abdallah argues that there was not competent, substantial evidence that K.N.'s state of inebriation reached a point of physical helplessness or physical incapacitation at which she could not resist him. And, according to Abdallah, she would have no cause to resist him because she consented to the sexual encounter.

b. The State's evidence and our standard of review

---

[5] See footnote 7, infra.

8

While Abdallah urges us to accept his version of events, we do not reweigh the evidence presented to the jury. Fitzpatrick v. State, 900 So. 2d 495, 508 (Fla. 2005) ("The fact that the evidence is contradictory does not warrant a judgment of acquittal because the weight of the evidence and the witnesses' credibility are questions solely for the jury. It is not this Court's function to retry a case or reweigh conflicting evidence submitted to the trier of fact.") (citation omitted). Our inquiry is limited to whether the jury's verdict is supported by competent, substantial evidence. Arroyo v. State, 252 So. 3d 374, 379 (Fla. 3d DCA 2018) ("[W]e will not reverse if there is competent substantial evidence supporting the jury's finding."). "In moving for a judgment of acquittal, a defendant 'admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.'" Beasley v. State, 774 So. 2d 649, 657 (Fla. 2000) (quoting Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974)). Against this backdrop, we review the evidence presented by the State regarding each element of the sexual battery crimes with which Abdallah was charged.

(i) First element: a sexual battery occurred

Abdallah admitted in his statement to police both that he digitally penetrated K.N. and that his penis touched K.N.'s vagina. Hence, there was competent, substantial evidence supporting the first element.

(ii) Second element: the act was without consent

The issue of consent falls within the province of the jury and generally does not lend itself as a basis for a judgment of acquittal. Shrader v. State, 278 So. 3d 270, 280 (Fla. 2d DCA 2019). The relevant statute defines consent as follows: "'Consent' means intelligent, knowing, and voluntary consent and does not include coerced submission. 'Consent' shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender." § 794.011(1)(a), Fla. Stat. (2016).

While K.N. could not recall her encounter with Abdallah that night, K.N.'s limited testimony together with Adriana's testimony regarding the night's occurrences, coupled with the surveillance video, provide the basis for a reasonable inference by the jury that K.N. did not give "intelligent, knowing, and voluntary" consent to Abdallah. See § 794.011(1)(a), Fla. Stat. (2016). The jury could have accepted Abdallah's version of events in which he claimed that K.N. consented, but it chose not to do so.

We therefore conclude on this record that the State established K.N.'s lack of consent with competent, substantial evidence.

10

(iii) Third element: the victim was either "physically unable to resist" or "physically incapacitated"

As with consent, whether the State presented sufficient evidence of K.N.'s physical helplessness to resist and physical incapacitation was a jury question. Arroyo, 252 So. 3d at 379. To establish K.N.'s physical helplessness, the State was required to show that K.N. was "unconscious, asleep, or for any other reason physically unable to communicate unwillingness to an act." § 794.011(1)(e), Fla. Stat. (2016). The State's evidence, viewed in the light most favorable to the State, showed an inebriated K.N. falling to the ground twice (at the restaurant and in front of her apartment building) and hitting her head with the first fall; her drifting in and out of consciousness during the entire time she was in Abdallah's presence; Abdallah carrying K.N. from the sidewalk to the entry of her apartment, propping her up during the elevator ride; and Abdallah carrying K.N. to her bedroom and placing her on her bed where she lay limp. The extensive evidence of K.N.'s helplessness was sufficient for the jury to infer that K.N. was unable to communicate an unwillingness to have sexual relations.

To establish K.N.'s physical incapacity, the State was required to establish that K.N. was "bodily impaired or handicapped and substantially

11

limited in ability to resist or flee." § 794.011(1)(j), Fla. Stat. (2016). The evidence adduced by the State showed that K.N. was, by any objective measure, "bodily impaired" by her extreme inebriation. K.N. exited Abdallah's car and collapsed to the sidewalk. She was unable to walk. She could not open her apartment door. After entering the apartment, Abdallah made the presumptuous decision to take K.N. directly to her bedroom where he placed her on her bed. Lacking any physical or mental resolve, K.N. was in no condition to resist Abdallah or to flee her own apartment.

We therefore conclude that the State met its burden to prove the existence of the statutory enhancements of sexual battery with specified circumstances. Arroyo, 252 So. 3d at 379.

### c. Coley v. State distinguished

Abdallah not only argues that the State failed to present competent, substantial evidence that the sexual battery was not consented to, he also suggests that, based on this Court's decision in Coley v. State, we are required to reverse. Indeed, in Coley, we reversed the defendant's criminal conviction for sexual battery, because at trial the victim "conceded that she may have given consent to the acts in question. That concession gives rise to a reasonable doubt with respect to the offense of battery." Coley, 616 So. 2d at 1022. Abdallah analogizes the victim's express concession in Coley to

a concession he argues K.N. has made in the instant case. According to Abdallah, because K.N. has no recollection of most of the events of that Friday night, she "concedes" Abdallah's version that she was a willing participant in their sexual encounter. As a result, Abdallah maintains that, at trial, he raised a reasonable doubt as to the element of consent. Id.

We do not, though, read Coley so broadly. In Coley, the victim expressly conceded that she may have given consent to the acts in question – a fact not present in the instant case. Further, the evidence in Coley also showed "that [the victim] was physically able to communicate at all relevant times" and able to "describe the sexual acts charged in the information." Id. at 1020. The Coley court determined that "there is no evidence which would support a finding, beyond a reasonable doubt, of a physical inability to communicate unwillingness." Id. at 1021. We view these distinctions as critically important for, in our case, there was no express concession of consent, and, as discussed in section II. A. 1. b. (iii), *supra*, the evidence was sufficient to establish that K.N. was physically unable to communicate unwillingness.

Coley therefore is distinguishable and, contrary to Abdallah's argument, does not compel reversal of Abdallah's conviction. Accordingly,

we will not disturb the jury's verdict on the two counts of sexual battery with specified circumstances.

2. The felony burglary charge – section 810.02

Abdallah argues that the trial court erred by denying his motion for judgment of acquittal with regard to the burglary charge. Section 810.02 defines a "remaining in" burglary as "a licensed entry, remaining in a dwelling, structure or conveyance . . . [t]o commit or attempt to commit a forcible felony, as defined in s. 776.08." § 810.02(1)(b) 2.c., Fla. Stat. (2016). Burglary is a first-degree felony "if, in the course of committing the offense, the offender . . . [m]akes an assault or battery upon any person." § 810.02(2)(a), Fla. Stat. (2016).

Abdallah's argument mirrors his argument with regard to the sexual battery charge – because Abdallah asserts that he cannot be found guilty of sexual battery, then the burglary charge must also fail. Considering our holding in section II. A. 1., *supra*, that affirms Abdallah's sexual battery conviction, we conclude that the State provided competent, substantial evidence that Abdallah remained in K.N.'s apartment (after Adriana instructed him to leave) for the purpose of committing the charged offense. Thus, concluding that the State presented sufficient evidence of the

elements of felony burglary, we affirm the trial court's denial of Abdallah's motion for judgment of acquittal of the burglary charge.

*B. Special Jury Instruction*[6]

Abdallah next asserts that the trial court abused its discretion by declining to give the following "good faith" special jury instruction proffered by Abdallah:

> Good-Faith is a complete defense to sexual battery on an [sic] physically helpless or physically incapacitated person. If the defendant acted in good faith, sincerely believed the victim was a willing participant and consented to the sexual acts, the Defendant cannot be found guilty of sexual battery upon a physically helpless or incapacitated person. The state of mind of the Defendant is relevant to determine whether or not he violated the law.

To receive a special jury instruction, a defendant must demonstrate: "(1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing." Stephens v. State, 787 So. 2d 747, 756 (Fla. 2001) (footnotes omitted). Because Abdallah maintained that this special jury instruction

---

[6] We review a trial court's denial of a defendant's request for a special jury instruction for abuse of discretion. Talley v. State, 260 So. 3d 562, 568 (Fla. 3d DCA 2019).

15

would have reflected his theory of defense, he argues that the trial court committed reversible error in refusing to give the instruction to the jury.

A special jury instruction, though, is not warranted if the standard jury instruction adequately addresses the relevant legal standard. Id. at 755. The standard jury instructions on sexual battery under specified circumstances include the element of consent and employ section 794.011(1)(a)'s consent language of "intelligent, knowing, and voluntary consent."[7] The law's focus

---

[7] The trial court instructed the jury on this charge as follows:

> To prove the crime of Sexual Battery Under Specified Circumstances, as charged in Count II of the Information, the State must prove the following five elements beyond a reasonable doubt: 1. NIMER ABDALLAH committed an act upon [K.N.] in which the sexual organ of NIMER ABDALLAH penetrated or had union with the vagina of [K.N.] 2. [K.N.] was physically helpless to resist and/or physically incapacitated. 3. NIMER ABDALLAH's act was committed without the consent of [K.N.]. 4. At the time of the offense, [K.N.] was 18 years of age or older; and 5. At the time of the offense, NIMER ABDALLAH was 18 years of age or older.

> "Consent" means intelligent, knowing, and voluntary consent and does not include coerced submission. Consent does not mean the failure by the alleged victim to offer physical resistance to the offender.

> "Union" means contact.

> "Physically helpless" means that a person is unconscious, asleep, or for any other reason physically unable to communicate unwillingness to act; and

is on whether the victim consented and not on the perpetrator's state of mind. "State of mind is not a material fact in a sexual battery charge, nor is intent an issue." Coler v. State, 418 So. 2d 238, 239 (Fla. 1982).

Here, Abdallah again relies on language in Coley. Specifically, Abdallah argues that the following passage from Coley makes his state of mind a relevant consideration to the jury:

> While the state elicited much testimony about the victim's subjective state of mind, there is an absence of evidence to show defendant knew, or that it was apparent to defendant, that the victim was unable to give a knowing and voluntary consent.

Coley, 616 So. 2d at 1023.

Abdallah misreads Coley in this regard. The passage's reference to whether the defendant "knew . . . the victim was unable to give consent" relates to the victim's capacity to communicate, not to the general state of mind of the defendant. The victim in Coley was able to communicate, and she conceded that she "may have consented." Id. at 1021. Here, the evidence showed that K.N. was *not* communicative, and did not have the capacity to consent. On this record, we are unable to conclude that the trial court abused its discretion by denying the special jury instruction.

---

"Physically incapacitated" means that a person is bodily impaired or handicapped and substantially limited in his or her ability to resist or flee an act.

17

*C. The Uber Settlement*[8]

Regarding K.N.'s settlement of her civil case against Uber, Abdallah challenges both (i) the trial court's denial of his motion to compel non-party Uber to provide Abdallah with a copy of the settlement agreement, and, relatedly, (ii) the trial court's limitations placed on Abdallah's ability to cross-examine K.N. with regard to the settlement. We address each in turn.

1. Motion to compel settlement agreement

Before the criminal trial, K.N. entered into a confidential settlement agreement with Uber, and Abdallah sought to compel Uber to produce the settlement agreement. While the trial court denied Abdallah's motion to compel and did not conduct an *in camera* review of the document as Abdallah had requested, the trial court did allow Abdallah to conduct a second deposition of K.N. where Abdallah was allowed to inquire into the Uber lawsuit and settlement agreement.

Abdallah wanted to review the settlement agreement in order to assess whether K.N.'s narratives in the civil and criminal proceedings were consistent. Abdallah argued that the settlement agreement was necessary

---

[8] The trial court's denial of Abdallah's motion to compel the production of the Uber settlement agreement and its limitation on Abdallah's cross-examination of K.N. on the settlement itself are reviewed for abuse of discretion. McDuffie v. State, 970 So. 2d 312, 324 (Fla. 2007).

to allow his defense to test K.N.'s bias and motives. The subject matter and allegations of the class action civil complaint against Uber (of which K.N. was one plaintiff), however, were open and of record. Uber appeared below and represented to the trial court that the settlement agreement itself did not contain factual statements or admissions or information related to Abdallah's criminal trial. The State argued that the settlement agreement was irrelevant, and that Abdallah sought it in order to plant a suggestion with the jury that K.N. was made whole by her financial settlement with Uber, which the jury should consider when deciding whether to convict Abdallah.

The record reflects that the trial court balanced these competing interests and ultimately decided not to compel Uber to produce the settlement agreement. While it might have been better practice for the trial court to have conducted an *in camera* review of the settlement agreement, see Friedman v. Heart Inst. of Port St. Lucie, Inc., 863 So. 2d 189, 194 (Fla. 2003), on this record we are unable to conclude that the trial court abused its discretion in finding both that K.N.'s motives for entering into the settlement agreement, and the financial terms of K.N.'s settlement with Uber,

were irrelevant to the criminal proceedings. See §§ 90.401, 90.402 (Fla. Stat. (2016).[9]

2. Limitation on cross-examination

Prior to trial, the State filed a motion *in limine* to preclude all mention of K.N.'s lawsuit against Uber. In its ruling on the State's motion, the trial court allowed some questioning of K.N. about aspects of her dealings with Uber, but limited Abdallah from inquiring into what the trial court deemed issues collateral to the criminal case. The trial court restricted Abdallah to questions about (i) the timing of K.N.'s initial contact with Uber, (ii) K.N.'s filing a lawsuit against Uber, (iii) whether the lawsuit was settled, and (iv) whether K.N. received settlement compensation.

Arguing that the trial court's order was too limiting, prior to trial Abdallah made a proffer seeking leave to address additional areas of inquiry: (i) whether K.N.'s allegation in the civil lawsuit contradicted her testimony in the criminal trial that she had no memory of the sexual battery; (ii) K.N.'s

---

[9] While the trial court excluded the settlement agreement on relevance grounds, it appears that the trial court also excluded it because of its potential for prejudice. See State v. Aylesworth, 666 So. 2d 181, 182 (Fla. 2d DCA 1996) (holding that exclusion of civil settlement agreements in a criminal prosecution was appropriate when their potential prejudice outweighed their probative value).

20

desire, stated in a letter to Uber, that the case not be submitted to arbitration so she (and her co-plaintiffs) could litigate publicly; (iii) the terms of the settlement agreement; (iv) the amount of the settlement; and (v) whether K.N. gave a deposition in the civil lawsuit. Abdallah wanted to cross-examine K.N. on the settlement agreement to show: (i) K.N.'s financial interest in Abdallah's conviction; (ii) whether the settlement agreement imposed on K.N. any obligation to maintain the same narrative of events in the criminal case that K.N. had asserted in her civil claim; and (iii) whether her testimony was consistent with her explication of events in the civil case.

The trial court denied Abdallah's proffers in this regard, and at trial sustained multiple State objections to Abdallah's attempts to exceed the limitations it had placed on such inquiry. Abdallah argues that the trial court's limitations on his ability to question K.N. about her settlement with Uber thwarted his right to conduct a full and fair cross-examination, see Docekal v. State, 929 So. 2d 1139, 1142 (Fla. 5th DCA 2006), thus undermining his right to examine K.N. for bias or improper motive. See Harden v. State, 87 So. 3d 1243, 1249 (Fla. 4th DCA 2012).

Ordinarily a defendant may cross-examine a witness regarding her civil lawsuit related to the crime. Graves v. State, 937 So. 2d 1286, 1290 (Fla. 4th DCA 2006). As mentioned above, though, the trial court found that the terms

21

of the settlement agreement were not relevant to the criminal proceedings. Additionally, because Abdallah sought to use the lawsuit and settlement agreement to show bias on K.N.'s part, the trial court weighed prejudice versus the probative value of this potential evidence. The trial court determined that allowing extensive cross-examination into the terms of the settlement agreement would mis-direct the jury down a path toward collateral matters. Nelson v. State, 704 So. 2d 752, 754 (Fla. 5th DCA 1998) (holding that cross-examination may be limited when the probative value of the evidence is outweighed by its prejudicial impact on the jury).

While we generally approve of the trial court's approach in limiting jury exposure to the civil lawsuit, we conclude that the trial court's ruling was too limiting in one respect. Given K.N.'s inability to recollect the night's events, it appears that what K.N. told Uber regarding the events would be within the permissible scope of cross examination. See Pearce v. State, 880 So. 2d 561, 569 (Fla. 2004) ("[I]ntroduction of a prior statement that is inconsistent with a witness's present testimony is . . . one of the ways to attack the credibility of a witness. . . . To be inconsistent, a prior statement must either directly contradict or be materially different from the expected testimony at trial.").

22

Nonetheless, given Abdallah's statement to the police, the public availability of the allegations in the civil lawsuit, Adriana's account of the night's events, the DNA evidence, the surveillance video, and K.N.'s testimony about the existence of the Uber lawsuit, we further conclude that any error by the trial court in limiting Abdallah's cross-examination in this regard was harmless. There is not a reasonable possibility that this error, examined in light of the totality of the evidence, contributed to the verdict.[10] See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

*D. Expert Testimony[11]*

Next, we address Abdallah's argument that the trial court reversibly erred by allowing Dr. Lisa Reidy – whose lab had performed the testing on K.N.'s blood and urine after K.N. had been examined by the rape treatment center – to give opinion testimony as to whether K.N. had been drugged on the night in question. Over defense objection, the State qualified Dr. Reidy as an expert to offer her opinions on the potential impact on K.N. of combining three alcoholic drinks with a central nervous system depressant

---

[10] The record reflects that the facts described in the civil lawsuit's complaint are substantially similar to those developed in the criminal trial.

[11] We review a trial court's admission of expert testimony for abuse of discretion. Medina v. State, 260 So. 3d 419, 422 (Fla. 3d DCA 2018).

drug. See § 90.702, Fla. Stat. (2021). Specifically, the State sought Dr. Reidy's view on how the date rape drug GHB (Gamma-Hydroxybotric) might have affected K.N. given K.N.'s testimony that she, a casual drinker who had not before been so intoxicated, had consumed three alcoholic drinks over the course of the evening.

Over defense objection, the State showed Dr. Reidy the surveillance video of K.N. departing the Uber and entering her apartment building, and it sought Dr. Reidy's opinion testimony as to how both K.N. (and Adriana) might have become so intoxicated.

Dr. Reidy opined that K.N. did not behave like a woman who had consumed merely three alcoholic drinks. Dr. Reidy opined that K.N.'s behavior was more consistent with a mixing of alcohol and a central nervous system depressant. Of critical importance, there was no testimony during the questioning of Dr. Reidy, or at any other time during the trial, to suggest that Abdallah had drugged K.N. Indeed, the trial court offered to give a limiting instruction to this effect, which the defense declined. The State argues that Dr. Reidy's testimony was offered for the purpose of establishing the connection between K.N.'s profound intoxication and her ability to consent.

Abdallah argues that Dr. Reidy's testimony was highly prejudicial because (i) implicitly, it led the jury to believe that Abdallah had drugged K.N.,

24

and (ii) it created an inference that K.N. could not effectively communicate consent because she was drugged. We disagree.

The trial court determined that Dr. Reidy's expert testimony was more probative on the issue of consent and K.N.'s physical incapacitation than it was unfairly prejudicial to Abdallah or misleading to the jury. See § 90.403, Fla. Stat. (2016); McDuffie, 970 So. 2d at 327 ("In performing the balancing test to determine if the unfair prejudice outweighs the probative value of the evidence, the trial court should consider the need for the evidence, the tendency of the evidence to suggest an emotional basis for the verdict, the chain of inference from the evidence necessary to establish the material fact, and the effectiveness of a limiting instruction."). The trial court offered to give – but Abdallah declined – a special, limiting instruction to ameliorate any potential prejudice. Under these circumstances, we cannot conclude that the trial court abused its discretion in allowing Dr. Reidy's testimony.

E. *Admission of video surveillance footage*[12]

Finally, Abdallah argues that the trial court abused its discretion by admitting into evidence video surveillance footage and accompanying photographs from K.N.'s apartment building without proper authentication.

---

[12] The trial court's ruling on the authentication of the surveillance video from K.N.'s apartment building is reviewed for an abuse of discretion. Mullens v. State, 197 So. 3d 16, 25 (Fla. 2016).

"Authentication or identification of evidence is required as a condition precedent to its admissibility. The requirements of this section are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." § 90.901, Fla. Stat. (2016).

There are two methods to authenticate evidence such as an apartment building's surveillance video: the pictorial method and the silent witness method. Wagner v. State, 707 So. 2d 827, 830 (Fla. 1st DCA 1998). The pictorial method depends upon testimony of a witness, based on personal knowledge, that the video or photo is a fair and accurate portrayal. The silent witness method depends upon proof that the process that produced the video or photo was reliable. Id.; see also City of Miami v. Kho, 290 So. 3d 942, 944 (Fla. 3d DCA 2019).

The trial court determined – and we agree – that the surveillance video was authenticated through both methods. First, the video was authenticated through the pictorial method as a fair and accurate representation of the time period after K.N. and Adriana's exit from Abdallah's car. K.N. and Adriana testified that they reviewed the surveillance video and recognized themselves and the environment depicted in the video. K.N. recognized the clothing she wore that night. Adriana recognized the third person with them,

26

Abdallah. Their imperfect memories of certain events from that night do not preclude their ability to recognize themselves and each other.

Additionally, the State linked up the women's testimony with that of the investigating detective, Hector Aleman, who was able to authenticate the video through the "silent witness" authentication method. With a subpoena, Detective Aleman obtained the surveillance video from the security office of K.N.'s apartment building. With a video forensics detective, he downloaded the video and then impounded it in the property room. Because Detective Aleman discovered that a part of the video he had obtained was missing, he returned to the apartment building and retrieved the missing video clip on a USB drive. The full surveillance video showed K.N., Adriana and Abdallah outside K.N.'s apartment building and inside the elevator. The video introduced into evidence at trial was the same video that Detective Aleman recovered from K.N.'s apartment building. Because the video was appropriately authenticated, the trial court did not abuse its discretion by allowing the jury to view it.

### III. Conclusion

We affirm the trial court's denial of Abdallah's motions for judgment of acquittal. The State presented competent, substantial evidence supporting the elements of the crimes for which Abdallah was convicted. The trial court

did not abuse its discretion by denying Abdallah's request for a special jury instruction. While in some instances we might have ruled differently, we also affirm the challenged evidentiary rulings by the trial court; any error limiting inquiry into K.N.'s lawsuit against Uber was harmless.

Affirmed.